# 18-2782

# United States Court of Appeals
# for the Second Circuit

GRIEVANCE COMMITTEE OF THE
EASTERN DISTRICT OF NEW YORK,

*Petitioner-Appellee,*

v.

RICHARD E. LERNER,

*Respondent-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR RESPONDENT-APPELLANT

RICHARD E. LERNER, ESQ.
*Respondent-Appellant Pro Se*
69-46 Harrow Street
Forest Hills, New York 11375
(917) 584-4864
richardlerner@msn.com

3454



**ELECTRONIC
PARALEGAL**

*Page*

A. Preliminary Statement and Issues Presented ........................................................1

   1. Questions Presented..........................................................................................1

B. Standard of Review.................................................................................................7

C. Statement of the Case.............................................................................................8

D. Statement of Facts................................................................................................10

E. The Record Viewed in the Light Most Favorable to Appellants........................13

   i. Sater's Criminal Proceeding...........................................................................13

   ii. The Delaware Action Against Bayrock and the *Kriss I* Lawsuit .................15

   iii. The 2010 Order to Show Cause and Related Proceedings.............................18

Argument

Point I

The Committee Denied Appellants Their Due Process Rights ...............................41

   A. Grievance Proceedings Require Due Process................................................41

   B. The *Mathews v. Eldridge* Balancing Test in Disciplinary Contexts .............42

   C. Heightened Due Process for Severe, Stigmatizing Findings: "Felony-Equivalent" Findings and 'Stigma-Plus' Doctrine........................................44

   D. Due Process Required that the Committee Identify the Orders Appellants Allegedly Knew They Would be Violating, their Decretal Language, and the Specific Acts that Allegedly Contravened Them ....................................46

E. Due Process Required the Committee to Hold an Evidentiary Hearing..................................................................................................49

F. Appellants Were Deprived of Their Right and Opportunity to Cross-Examine and Confront Their Accusers ........................................................56

G. The Committee Could Not Rely on Statements Made in Prior Proceedings as Preclusive Unless the Requirements for Issue Preclusion Were Satisfied, which They Were Not...................................................................................60

H. The Committee Could Not Determine Culpable State of Mind on the Disputed Paper Record Presented to Them .......................................................63

I. Due Process Requires Notice of the Charges and an Opportunity to Be Heard....................................................................................................64

    i. Appellants did not receive fair notice regarding the charge that they committed attempted larceny by extortion..............................64

    ii. Appellants Were Denied an Opportunity to be Heard as to both Legal and Factual Defenses to the Charge of Attempted Larceny by Extortion.................................................................................70

    iii. Oberlander did not threaten dissemination of "sealed" materials ..................................................................................71

    iv. It is not larceny by extortion to threaten to accuse a person of a crime when the crime did occur and redress for the wrong is sought ........................................................................................74

    v. Writing an intra-litigation settlement demand letter is not wrongful; it is protected petitioning, and cannot constitute extortion .....................................................................................75

    vi. Oberlander's clients had a good faith legal claim to damages of $35,000,000, plus potential trebling, and thus the demands were not wrongful or extortionate .......................................................79

ii

vii.    Threatening to Reveal the "Secret" of Sater's Conviction Was Not Extortion by Larceny..................................................................80

viii.    Sater's conviction and cooperation was no "secret."....................82

ix.    Neither Oberlander nor Lerner had the specific intent to attempt larceny by extortion and Lerner engaged in no act in furtherance thereof..............................................................................83

Point II

The Court Erred in Rejecting the Constitutional Standards for Punishing Speech Regarding the Judiciary, and Instead Applied Obsolete, and Unconstitutional, Standards from *Holtzman* and *Bevans* .....................................................................87

A. Introduction..........................................................................................87

B. Had the Committee applied the correct standards, it could not have imposed discipline for appellants' speech regarding the judiciary .............................93

i.    The Committee could not, from a paper record, determine that appellants' statements were "malicious.".............................................94

ii.    The Committee cannot discipline appellants for statements not contained in the disciplinary charges.......................................94

iii.    The Committee Bore the Burden to Prove Each of the Charged Statements False ...........................................................95

C. The Appellants Had a Reasonable Basis in Fact for the Charged Statements and at the Very Least Were Entitled to a Hearing to Demonstrate the Bases for their Statements..................................................................................96

D. Attorneys Must be Protected in Checking the Use of Judicial Power and Preserving Open Court Processes............................................................104

Point III

The Federal Statute of Limitations Applies to Original Federal Court Disciplinary Proceedings ..............................................................................................106

Point IV

The Order of June 13, 2024, Imposing an Additional Year of Suspension Must be Vacated for the Same Reasons as Set Forth Above, Plus One Additional Reason ...................................................................................................................109

Point V

On Remand, the Committee Should be Directed to Have an Independent Counsel First Investigate Whether there Are Any Valid Charges, and then Advise Which Charges Warrant Prosecution...................................................................110

Point VI

The Entire Docket of this Proceeding Should be Unsealed...................................110

Conclusion .............................................................................................................112

Certificate of Compliance .....................................................................................113

*Page(s)*

**Cases:**

*ABC, Inc. v. Stewart*,
        360 F. 3d 90 (2d Cir. 2004) ....................................................................20

*Alemite Mfg. v. Staff*,
        42 F.2d 832 (2d Cir. 1930) ...............................................................18, 24

*Bart v. Golub Corp.*,
        96 F. 4th 566 (2d Cir. 2024) .................................................................7

*Bates v. State Bar of Ariz*,
        433 U.S. 350 (1977).............................................................................105

*Berry v. Midtown Service Corp.*,
        104 F.2d 107 (2d Cir. 1939) ..................................................................3

*Blatt v. Dean Witter Reynolds*,
        732 F.2d 304 (2d Cir. 1984) .................................................................80

*Borough of Duryea v. Guarnieri*,
        564 U.S. 379 (2011)..............................................................................17

*Bousley v. U.S.*,
        523 U.S. 614 (1998).............................................................................68

*Bridge CAT Scan Associates v. Technicare Corp.*,
        710 F. 2d 940 (2d Cir. 1983) ................................................................24

*Carroll v. President and Comm'rs of Princess Anne*,
        393 U.S. 175 (1968)..............................................................................31

*Chase Nat. Bank v. Norwalk*,
        291 U.S. 431 (1934)........................................................................18, 24

*Cheves v. Trustees of Columbia Univ.*,
        89 A.D.3d 463 (1st Dep't 2011) ....................................................... 108-109

*Citizens United v. FEC,*
558 U.S. 310 (2010)............................................................26

*Cobb v. Pozzi,*
363 F.3d 89 (2d Cir. 2004) ...............................................61, 62

*Cole v. Arkansas,*
333 U.S. 196 (1948).........................................................68, 69

*Consolidated Elec. v. U.S. for Use,*
355 F.2d 437 (10th Cir. 1966) ...........................................63

*Craig v. Harney,*
331 U.S. at 374 .................................................................18

*Dawkins v. Williams,*
511 F.Supp.2d 248 (NDNY 2007) ...................................81, 82

*Deck v. Engineered Laminates,*
349 F.3d 1253 (10th Cir. 2003) ........................................76, 78

*DeJonge v. State of Oregon,*
299 U.S. 353 (1937).........................................................68

*DirectTV v. Lewis,*
2005 WL 1006030 (W.D.N.Y. 2005)................................76, 77

*Dolan v. United States,*
590 U.S. 605 (2010).........................................................33

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,*
365 U.S. 127 (1961).........................................................67

*Elonis v. U.S.,*
575 U.S. 723 (2015).........................................................86

*Ex Parte United States,*
242 U.S. 27 (1916)...........................................................33

*Fonar Corp. v. Deccaid Services*,
983 F. 2d 427 (2d Cir. 1993) ........................................................46

*Gambale v. Deutsche Bank*,
377 F. 3d 133 (2d Cir. 2004) ......................................................111

*Garrison v. Louisiana*,
379 U.S. 64 (1964)..............................................................*Passim*

*Gitlow v. New York*,
268 U.S. 652 (1925).....................................................................87

*Goldberg v. Kelly*,
397 U.S. 254 (1970)................................................................45, 59

*Granny Goose Foods v. Brotherhood of Teamsters*,
415 U.S. 423 (1974)....................................................................47

*Greene v. McElroy*,
360 U.S. 474 (1959)..................................................46, 48, 49, 95

*Gunn v. University Committee to End War*,
399 U.S. 383 (1970)......................................................................3

*H.P. Lambert Co. v. Secretary of the Treasury*,
354 F.2d 819 (1st Cir. 1965)......................................................107

*Hartford Courant v. Pellegrino*,
380 F.3d 83 (2d Cir. 2004) ................................................ 73-74, 97

*In re Bevans*,
233 N.Y.S. 439 (3d Dep't 1929) ..................................................87

*In re Holtzman*,
577 N.E.2d 30 (N.Y. 1991) ................................................89, 90, 91

*In re Holtzman*,
78 N.Y.2d 184 (1991)..................................................................87

*In re Oliver*,
    333 U.S. 257 (1948)..................................................................................99

*In re Peters*,
    642 F.3d 381 (2d Cir. 2011) ...............................................*Passim*

*In re Probst*,
    205 F. 512 (2d Cir. 1913) .........................................................................3

*In re Ruffalo*,
    390 U.S. 544 (1968)...................................................................*Passim*

*Knoll v. Merrill Corp.*,
    2003 WL 22682271 (SDNY 2003) ...........................................108

*Kokesh v. S.E.C*,
    581 U.S. 455 (2017).................................................................106, 108

*Kriss v. Bayrock Group LLC*,
    2016 US Dist LEXIS 167149 (SDNY Dec. 2, 2016)...........................*Passim*

*Legal Services Corporation v. Velazquez*,
    531 U.S. 533 (2001)..................................................91, 104, 105

*Lugosch v. Pyramid Co.*,
    435 F.3d 110 (2d Cir 2006) ...........................................................6, 73

*Malin v. Singer*,
    217 Cal.App.4th 1283 (2013) .......................................................81

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)...................................................42, 43, 44, 45

*NAACP v. Button*,
    371 U.S. 415 (1963)..................................................... 87-88, 92

*Nat. Res. Def. Council v. EPA*,
    19 F.4th 177 (2d Cir. 2021) ...........................................................7

*New York Times v. Sullivan,*
376 U.S. 254 (1964)........................................................................*Passim*

*Paul v. Davis,*
424 U.S. 693 (1976)................................................................44

*People v. Bracey,*
41 N.Y.2d 296 (1977).................................................83, 85, 86

*People v. Dioguardi,*
8 N.Y.2d 260 (1960)................................................................75

*People v. Wightman,*
104 N.Y. 598 (1887)................................................................76

*Press-Enterprise v. Superior Court,*
464 U.S. 501 (1984)..............................................................105

*Press-Enterprise v. Superior Court,*
478 U.S. 1 (1986)...............................................................105

*Professional Real Estate Investors v. Columbia Pictures,*
508 U.S. 49 (1993)..................................................................1

*Revson v. Cinque & Cinque,*
221 F.3d 71 (CA2 2000)...........................................................78

*Richmond Newspapers v. Virginia,*
448 U.S. 555 (1980)..............................................................105

*Rock v. Arkansas,*
483 U.S. 44 (1987)................................................................58

*Schmidt v. McKay,*
555 F.2d 30 (2d Cir. 1977) ................................................. 63-64

*Sheinbein v. Dudas,*
465 F.3d 493 (Fed. Cir. 2006) .................................................107

*St. Amant v. Thompson*,
390 U.S. 727 (1968)................................................................................89

*Standing Comm. on Discipline v. Yagman*,
55 F.3d 1430 ....................................................89, 95, 103, 104

*Sussman v. Bank of Israel*,
56 F.3d 450 (1995) ........................................................................78, 79

*Tolan v. Cotton*,
572 U.S. 650 (2014)...........................................................................13, 54

*U.S. v. Alcantara*,
396 F.3d 189 (2d Cir. 2005) ...........................................................97

*U.S. v. Clemente*,
640 F.2d 1069 (1981) ......................................................................79

*U.S. v. Coppa*,
00-Cr-196................................................................................13, 53

*U.S. v. Doe*,
63 F.3d 121 (2d Cir. 1995) ........................................................4, 39

*U.S. v. Sater*,
EDNY Docket No. 98-cr-1101 ...............................................1, 31

*United Mine Workers v. Pennington*,
381 U.S. 657 (1965)..........................................................................67

*United States v. Jackson*,
180 F.3d 55 (2d Cir. 1999) ..........................................................79

*United States v. Moore*,
968 F.2d 216 (2d Cir.1992) ...........................................................7

*US Bank Nat'l Ass'n v. Village at Lakeridge*,
583 U.S. 387 (2018)..........................................................................7

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
425 U.S. 748 (1976)..................................................................................105

*Washington v. Texas*,
388 U.S. 14 (1967)...................................................................................57


**Rules, Laws & Statutes:**

6 N.Y. Practice, Criminal Law § 12:9 (4th ed.).......................................75

18 U.S.C. § 1964 ..................................................................................30, 75

18 U.S.C. § 3663A ...............................................................................11, 13

18 U.S.C. § 3771 ..................................................................................11, 13

28 U.S.C. § 2462 .......................................................................................106

28 U.S.C. § 2624 .................................................................2, 107, 108, 112

28 U.S.C. § 455 ...................................................................................38, 102

FRCP 23.1 ...............................................................................................28, 73

FRCP 52 ........................................................................................................13

FRCP 65 ........................................................................................................27

FRCP 68 ........................................................................................................30

NY Penal Law § 110.00 ........................................................................64, 83

NY Penal Law § 155.05 ..................................................................64, 66, 70

NY Penal Law § 155.15 ..............................................................................74

NYRPC 3.3 ...................................................................................................92

NYRPC 8.2 .............................................................................................*Passim*

**Other:**

16C CJS Constitutional Law § 1641........................................................68

Restatement (2d) of Judgments § 28........................................................62

Wright & Miller, Federal Practice & Procedure § 2730..........................................64

Wright & Miller, Federal Practice & Procedure § 4416..........................................61

**A.  Preliminary Statement and Issues Presented**

This brief is respectfully submitted by pro se appellant Richard E. Lerner. [1] This case involves fifteen years of proceedings during which the appellants have been directly involved, and some twelve years of proceedings involving Felix Sater before appellants had ever heard of him. The grievance charges arise out of alleged violations of a non-existent sealing order issued in Sater's criminal prosecution, *U.S. v. Sater*, EDNY Docket No. 98-cr-1101, and appellant Oberlander's use of documents obtained outside of court process that were alleged to have been sealed in Sater's case.

*1.  Questions Presented*

1.  Did the Committee violate appellants' constitutional rights by failing to give notice of the orders that they were being charged with having violated, the decretal language thereof, the New York penal statutes that were alleged to have been violated, and the particular acts that constituted violations of the orders and statutes?

2.  In *Professional Real Estate Investors v. Columbia Pictures*, 508 U.S. 49, 60 (1993), the Supreme Court stated: "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation."

---

[1] "ECF" references are primarily to the EDNY docket of the Lerner matter, rather than the duplicative docket entries in the Oberlander matter.

*Query:* Did the Grievance Committee err in determining that Oberlander had improper motives when he used allegedly "sealed" documents in support of allegations that Felix Sater had committed predicate RICO acts by hiding his criminal conviction from investors, banks and insurers, where the complaint was held to have been meritorious?

3. As the burden of proof in the grievance proceeding was subject to the clear-and-convincing-evidence standard, whereas the preponderance-of-the-evidence standard applied elsewhere, did the Committee commit clear error in basing its determinations upon factual recitals from other courts, and in failing to review the paper record in the light most favorable to appellants?

4. Did the Committee violate appellants' constitutional rights by failing to apply the *New York Times v. Sullivan* standard in assessing whether statements of opinion and fact made by them violated the Disciplinary Rules?

5. Could the Committee fairly find that appellants violated an order barring dissemination of information from "John Doe's" PSR and the information that Doe was under a "cooperation agreement," when such information was ordered public by the U.S. Supreme Court?

6. Are the charges as to acts that pre-date by more than five years the Committee's issuance of OTSCs on October 20, 2016 time barred pursuant to 28 U.S.C. §2624?

Search in vain through the charging instruments herein—the Committee's

OTSCs against appellants—and the orders issued by the Committee for any

recitation of any actual order allegedly violated and its decretal language. There is

none. No one can be punished—whether by using the contempt power or the

grievance process—for "violating" a non-existent order, or an unsigned and

undocketed order, or an order lacking decretal language enjoining him from

speaking, or an expired TRO. *Gunn v. University Committee to End War*, 399 U.S.

383, 388-389 (1970).

As this Court stated in *Berry v. Midtown Service Corp.*, 104 F.2d 107, 110

(2d Cir. 1939) (quoting *In re Probst*, 205 F. 512 (2d Cir. 1913)):

> Our attention has been called to no writ, process, order, rule, decree, or
> command of the court which he [the alleged contemnor] has disobeyed. This
> may be a highly technical ruling; but where Congress has been so
> industrious to restrict the natural inherent powers of a federal court ECF 26
> ECF 26 ECF 26, scrupulous attention to the limitations it has imposed would
> seem to be the proper course.

Here, the Committee has subjected appellants to discipline for violating non-

existent orders, or, to the extent an order did exist—a Second Circuit order of

February 10, 2011, reiterated on February 14, 2011—it was expressly "temporary"

and expired no later than December 20, 2011, before any alleged act occurred that

could have violated the "temporary" order. On that date, December 20, 2011, this

Court issued its mandate, closing its docket of the 10-2905 *U.S. v. Doe* appeal, and thereby ended the "temporary" "pendente lite" injunction.

Years of litigation and grievance charges, based upon a false narrative, ensued from the claim that there was a sealing order in Sater's case that was somehow binding upon Oberlander (and Lerner, as his attorney), notwithstanding that the law is clear that no one can be bound by an order who is not a party to the proceeding or in privity with a party. The language of an order alleged to have been violated was not quoted from or paraphrased in any of the Committee's OTSCs or in its orders imposing discipline, because there is no decretal language of any order that could have been violated, as Judge Glasser acknowledged at an *ex parte* conference: (98cr1101, ECF 246)

> THE COURT: Given the Second Circuit's determination that in effect I can deal with your [the government's] March 17th letter [requesting the unsealing of Sater's case], I called you in because I think we ought to do that…. (p.2)[2]

***

---

[2] Notwithstanding that on June 29, 2011 this Court had directed Judge Glasser to take up and decide the government's motion to unseal Sater's case, on August 24, 2011, the government filed a secret *ex parte* motion—which was unknown to Lerner and Oberlander until the case docket was "inadvertently" made public by the clerk's office in August 2012—**to withdraw its motion to unseal**. Judge Glasser granted the motion to withdraw the motion to unseal on August 26, 2011, also unbeknownst to appellants, or the public. (See 98cr1101, ECF 120).

I didn't invite Mr. Lerner here because he doesn't represent a party who has a significant interest except a questionably illegitimate one for having the documents remain to be sealed. (sic) (p.9).[3]

***

The whole sealing issue arose only because when Mr. Doe [*i.e.*, Sater], when Jonathan Sach first filed that action, he filed it under seal and then I didn't know, I didn't recall but I had no doubt there was an order that I must have issued in some form under some circumstances and when you turned it up, where did you find that minute entry, that day sheet? I had no knowledge it ever existed which is why I made that statement on the record at one point. ***I couldn't find any order directing that anything be sealed.***

Interestingly enough, given 30 years of having responded and said "so ordered" I don't know how many times, at the end of the plea, ***except you forgot*** to make that request at the sentencing, the government or defense counsel always says "Judge, I would like to make an application that this proceeding be sealed," and invariably I would say "so ordered," and I would generally add "I suppose you want a caveat to be made that a copy of the transcript may be made available to either party upon request?" Everybody nods and I say "so ordered."

*Id.* at 16-17.

---

[3] Nonetheless, Judge Glasser, the government, Sater's counsel, and Sater himself spoke at length during the secret hearing about the merits of Lerner's arguments in the proceedings then before the court, as well as merits of Oberlander's claims in his lawsuit against Sater. During that *ex parte* conference, Sater's counsel stated: "MR. BEYS: What your Honor has heard from Mr. Roe [Oberlander] which is lying under oath, all these documents came to him unsolicited. That's not true. Yet, another reason we would like more time is for that litigation to be resolved so we can bring it to your Honor's attention." (See p.13).

Judge Glasser failed to refer Mr. Beys and the AUSA to the Grievance Committee for violating the rule against *ex parte* communications with judges. Instead, he participated in it, and failed to notify Lerner that Sater's counsel had discussed the merits of the SDNY case filed by Oberlander, and the veracity of Oberlander's testimony before him, in violation of the Code of Conduct of for United States Judges, Canon 3, *available at* https://www.uscourts.gov/administration-policies/judiciary-policies/ethics-policies/code-conduct-united-states-judges

By virtue of the fact that Judge Glasser acknowledged that for thirty years he had been doing it the same way—just stating "so ordered" when a request was made to seal—this destroys the Committee's clear-and-convincing-evidence finding that appellants intentionally violated a sealing order. There was none. It also demonstrates that any such sealing order, even if it had been "so ordered," would have been unenforceable, as lacking the requisite findings supportive of sealing. *Lugosch v. Pyramid Co*., 435 F.3d 110 (2d Cir 2006).

What are the specific words of the court orders that appellants allegedly violated? The Committee's OTSCs failed to identify the specific orders and the decretal language thereof, because there is no such order, much less decretal language of any order that was even arguably violated. Thus, any "findings" made pursuant to those OTSCs violate due process, as not having provided notice of the charges and an opportunity to respond thereto.

These entire grievance proceedings were built on a falsehood, proffered by Sater's counsel in unsworn submissions. It is grotesque, not just unconstitutional, a patent attempt to punish appellants for outspoken and fair criticism of the judiciary and the DOJ. In *Ex Parte Steinman and Hensel*, 95 Pa. 220, 238-239, Pennsylvania's high court stated that it would be "monstrous" to suggest that attorneys, by virtue of their license to practice law, have less right to criticize judges than non-attorneys:

No class of the community ought to be allowed freer scope in expression or publication of opinions as to the capacity, impartiality or integrity of judges than members of the bar. They have the best opportunities of observing and forming a correct judgment. They are in constant attendance on the courts…. To say that an attorney can only act or speak on this subject under liability to be called to account and to be deprived of his profession and livelihood by the very judge or judges whom he may consider it his duty to attack and expose, is a position too monstrous to be entertained for a moment under our present system.

**B.    Standard of Review**

Conclusions of law or mixed questions of fact and law are subject to a *de novo* standard. See *United States v. Moore*, 968 F.2d 216, 221 (2d Cir.1992).

Questions of due process likewise require *de novo* review *US Bank Nat'l Ass'n v. Village at Lakeridge*, 583 U.S. 387 (2018),

Importantly, because the Committee stated that the facts were "not in dispute," its decision was akin to a finding no disputed issue of material fact and granting summary judgment. *Nat. Res. Def. Council v. EPA,* 19 F.4th 177, 183 (2d Cir. 2021). As the Committee should have done, this Court must do: construe the evidence and draw all permissible inferences in the light most favorable to the "summary judgment" non-movants, appellant Lerner and co-appellant Oberlander. *Bart v. Golub Corp.*, 96 F. 4th 566 (2d Cir. 2024).

Otherwise, factual findings are typically reviewed for clear error or abuse of discretion, but factual findings material to determination of constitutional rights are reviewed *de novo*.

**C.     Statement of the Case**

Lerner and Oberlander appeal from orders of the EDNY Grievance Committee dated August 13, 2018, suspending them—Lerner for six months, Oberlander for one year—from practicing law in the EDNY (ECF 26, Oberlander ECF 14), and a related denial of reconsideration dated October 24, 2018. (ECF 34). In subsequent orders dated June 13, 2024, the Committee found that appellants "contravened" sealing orders (without finding of willfulness and identifying the decretal language of any order in force at the time it was allegedly "contravened"), warranting an additional imposition of a one-year suspension upon both appellants. (ECF 75, Oberlander ECF 33). A motion for reconsideration was denied on September 9, 2024. (ECF 78).

The proceedings commenced with unsworn letters by Sater's counsel in 2014 (ECF 1), docketed with the opening of the grievance cases on October 19, 2016 (ECF 1), and OTSCs, based upon the unsworn letters, were issued the following day, October 20, 2016. (ECF 2). Appellants responded to the OTSCs on September 6, 2017, with 110 exhibits (ECF 12-17), Lerner's declaration (ECF 18), an expert report of Professor Margaret Tarkington (ECF 19), memorandum of law (ECF 20), and a declaration of Oberlander (ECF 21).

On May 9, 2018, eight months after appellants made their submissions, the Committee appointed James Wicks "nunc pro tunc" "to investigate allegations

against the respondent, advise the Committee on Grievances whether prosecution of a disciplinary action is required, and, if directed, prosecute grievance proceedings on behalf of the Committee."

Wicks never conducted any investigation – at least any meaningful investigation. He did not interview appellants, Giannini, Vodicka, or any journalists to whom information was allegedly leaked, to assess himself and then advise the Committee whether the charges had merit. Nor did he submit any papers responding to appellants' submissions. Instead, the Committee issued its orders on August 13, 2018, three months after Wicks's appointment, finding that appellants had violated various disciplinary rules. Wicks's "nunc pro tunc" appointment to investigate was window dressing. He neither investigated nor "prosecuted" the grievance proceedings on behalf of the Committee, nor even addressed appellants' submissions.

With leave of court, an affidavit of Joseph Gianni, and a supplemental report of Professor Tarkington were submitted on June 7, 2018 and June 22, 2018 (ECF 24 & ECF 25, respectively). A letter from Archivist Stephanie Mark of the National Archives and Records Administration was also submitted (ECF 25-2), in which she confirmed that Sater's 98cr1101 file was sent to NARA in 2004, unsealed and was immediately available to the public.

9

In the first orders of August 13, 2018 imposing a six-month suspension from the EDNY on Lerner and a year on Oberlander, the Committee sustained six of the nine (unsworn) charges, and found that appellants violated the following ethics rules:

(1) Requirement to Withdraw (Rule 1.16(b)) (only as to Lerner);
(2) Engaging in discourteous conduct (Rule 3.3(f)(2));
(3) Engaging in illegal conduct (Rule 3.4(a)(6));
(4) Violating the Rules of Professional Conduct (Rule 8.4(a));
(5) Engaging in conduct prejudicial to the administration of justice (Rule 8.4(d)); and
(6) Engaging in conduct that adversely reflects on the lawyer's fitness as a lawyer (Rule 8.4(h)).

In the subsequent order of June 13, 2024, the Committee sustained an additional charge, finding that appellants had "contravened" court orders—without identifying the decretal language allegedly violated—and without finding the mens rea of intent to "contravene" court orders, and that appellants thereby violated Disciplinary Rule 3.4(a)(6), warranting an additional one-year suspension.

**D.    Statement of Facts**

This case can be stated simply, or it can be stated at length, given its 27-year history. The simple version is that appellants have been charged with, and found "by clear and convincing evidence" to have violated a non-existent, unsigned, undocketed order of Judge Glasser, and an order of this Court that was expressly

called a "temporary injunction" that had expired by the time of any alleged violation, as well as for having criticized the courts for conducting secret proceedings based upon non-existent sealing orders.

The alleged violations of sealing orders did not occur—they could not have occurred. The "information" that the Committee found to have been secret had been made public by the government and the courts themselves.

The Committee stated that it "appeared" that appellants leaked information to the Miami Herald about Doe/Sater that came from a redacted petition for cert filed in the U.S. Supreme Court. But the Committee did not identify what information "appeared" to it to have been leaked by appellants in violation of the decretal language of what order, and disregarded the Vodicka affidavit, attesting that he was the source of information for the Miami Herald story, and that he had figured out that "Doe" was Sater.

The Committee also imposed discipline upon appellants for having stated opinions—fair comment—that having secret criminal dockets undermines the rule of law and contravenes the Constitution and such statutes as the Mandatory Victims Restitution Act (18 U.S.C. §3663A) ("MVRA") and the Crime Victims' Rights Act (18 U.S.C. §3771) ("CVRA"). That's the short version.

A more full recitation of this saga is set out in appellants' declarations, in the unrebutted expert report of Margaret Tarkington and her unrebutted supplemental

report, as well as in the Vodicka and Giannini affidavits. The Committee's first suspension order begins with a lengthy "background" statement of facts—yet the "background" facts were adamantly disputed by appellants in their declarations. The Committee got almost all of the facts wrong.

Those documents—made public by the Supreme Court—discuss Sater's cooperation, his PSR, and the information contained therein evidencing judicial and prosecutorial misconduct. The Supreme Court deemed the information from Sater's PSR, *and the fact that he was a cooperator*, appropriate for public dissemination. But the Committee has sealed what the Supreme Court made public.

As the Supreme Court docket shows (see link to SCOTUS docket[4]), Lerner filed the petition for a writ of certiorari under seal on May 10, 2012, with the motion to allow its public dissemination. On June 25, 2012, the Supreme Court issued the following order: "The motion (11M122) for leave to file a petition for a writ of certiorari under seal with redacted copies for the public record is granted on condition that petitioners provide a redacted motion and petition *that remove any appended item containing a party's true name and any reference to such item within 30 days.*" (Emphasis added). On July 13, 2012, the Supreme Court docketed the following entry: "Petitioners complied with the order of June 25, 2012." As noted, the motion to allow the public filing of the petition, as well as the petition

---

[4] https://www.supremecourt.gov/search.aspx?filename=/docketfiles/12-112.htm

12

itself, contained information from Sater's PSR, and thus the Supreme Court itself allowed the public dissemination of information from Sater's PSR and the fact that "Doe"—*i.e.*, Sater—was a cooperator.

## E. The Record Viewed in the Light Most Favorable to Appellants

Because the Committee did not hold an evidentiary hearing but ruled entirely on paper submissions, the facts must be viewed in the light most favorable to Lerner and Oberlander. *Tolan v. Cotton*, 572 U.S. 650, 656-657 (2014). But even had the Committee engaged in appropriate factfinding under FRCP 52, their key factual assertions are clearly erroneous.

### i. Sater's Criminal Proceeding

In 1998, Felix Sater pled guilty in the EDNY ECF 26 before Judge Glasser to racketeering, along with Salvatore Lauria and Gene Klotsman for a "pump and dump" securities fraud scheme, costing victims at least $40 million. Sater, Lauia, and Klotsman became cooperators, agreeing to offer testimony against nineteen other co-conspirators who were indicted for conspiring in the same racketeering scheme under the case name *U.S. v. Coppa* (00-Cr-196). Despite the Mandatory Victim Restitution Act, 18 U.S.C. §3663A, and the Crime Victims' Rights Act, 18 U.S.C. §3771, which required mandatory victim identification and restitution, no vicitms of Sater's $40 million dollar fraud were identified at his sentencing in October 2009 and no order of restitution was made.

The June 8, 2018 letter submitted by appellants from Stephanie Mark, Supervisory Archive Specialist, of the United States National Archives and Records Administration, stated that in 2004 the Sater file was sent to the National Archives unsealed and was thus immediately available to the public: (ECF 25-2)

> Cases 98-CR- 1069 [Klotsman's file], 98-CR- 1101 [Sater's file] and 98-CR 1102 [Lauria's file] were retired to the National Archives from the [EDNY] U.S. District Court in Box 29 of Accession Number K02 1-04-0156-NY2 in August of 2004. Accession Number K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-NY2 was not sealed "whole box reference only.". These cases were immediately available to the public.

This confirms (a) that Sater's case (like Lauria's and Klotsman's, both of which contained documents showing that Sater was a cooperator) was made available to the public in 2004 ECF 25-2, years before Oberlander ever heard of Sater; (b) if there ever was an order sealing Sater's case (which there was not) such order became moot when Sater's case (along with Lauria's and Klotsman's) was sent to NARA and thereby made public.

Thus, even if an oral application had been made (of which there is no record—indeed, Glasser told Sater's attorneys at the secret *ex parte* conference discussing the issues raised by Oberlander "you forgot to make that request at the sentencing" (see 98cr1101, ECF 246, at pp. 16-17), his own account of how he "invariably" orally granted sealing requests belies that he engaged in any factfinding or adjudicated that such a sealing was essential to protect Sater from harm, was narrowly tailored, and that an order was actually signed and docketed.

14

Was there any time constraint on the sealing order? Was there any language purporting to gag anyone who was present in court during the plea hearing from revealing what was said? Was there any language barring anyone who was not a party to the Sater proceedings from revealing what was stated at the plea hearing? Was the plea hearing itself conducted in an open or in a sealed courtroom?

And the Committee disregarded a letter dated November 21, 2001, from EDNY AUSA Eric Corngold confirming that Sater and Lauria were cooperating witnesses. (ECF 24-6, p.2, Corngold letter, Ex. G to Giannini affidavit). Yet the Committee said that there was no dispute that Oberlander exposed Sater to risk in 2010 and thereafter by allegedly outing Sater as a cooperator. Everyone already knew in 2000. The Committee got it totally wrong, woefully wrong.

### ii.　　The Delaware Action Against Bayrock and the *Kriss I* Lawsuit

The only one who has contradicted Oberlander is Sater's counsel, who made the statement during the secret *ex parte* conference at a time when it could go unchallenged, because neither Oberlander nor his counsel Lerner were invited, nor even given advance notice of the *ex parte* hearing. Again, the fact that Judge Glasser did allow such *ex parte* discussions, and failed to notify Lerner (as counsel for Oberlander) that such *ex parte* contentions had been made, should warrant this Court's opprobrium, not at Lerner and Oberlander for calling such *ex parte* discussions violations of ethics rules by Sater's counsel, the government and the

judge himself. No, the court's opprobrium should be directed at Sater's counsel, the AUSA and Judge Glasser. And the fact that it did occur demonstrates that appellants' criticisms of the court were fair, to say the least.

In 2009, Oberlander filed a books-and-records action in the Delaware Chancery Court on behalf of Kriss against Bayrock Group LLC, et al., Docket Nos. 4154 VCS. The proceedings therein placed in the public record a great deal of the information that was later incorporated into the Kriss I complaint and articles written about Sater and Bayrock.

In May 2010, Oberlander filed the *Kriss I* complaint in the SDNY on behalf of Kriss and another member, Michael Ejekam, against the remaining members of Bayrock—Tevfik Arif, Julius Schwarz, and Felix Sater—and, importantly, derivatively against Bayrock. The complaint laid out massive fraud and money laundering as to major real estate developments involving Sater and the real estate projects that he was involved in, particularly the Bayrock projects.

As it was a meritorious complaint, Oberlander's motives in filing it—and serving demand letters threatening adverse publicity when it would eventually "lawfully and legally" go public—cannot be questioned, it being the most fundamental core protected speech, petitioning the government for redress of grievances. The Petition Clause "protects the right of individuals to appeal to

courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).

This Court may be unaware that the first public dissemination of the *Kriss I* complaint, then under seal in the SDNY, and which included the facts of Sater's cooperation, was made by Sater himself. He filed it as an exhibit to a lawsuit he had brought in Israel. (See discussion of these events at ECF 18, pp. 13-14 of the Lerner declaration, and referenced exhibits). Clearly, if Sater himself had believed that its public dissemination, by filing it in Israel, was appropriate, he could not fairly contend (through counsel's unsworn grievance complaints) that it endangered his safety or that the threat that it would eventually go public would pressure him into settling the case.[5]

This is all to say, the Committee clearly erred when it stated that there was "no dispute" that Oberlander exposed Sater to risk, and that it was *extortionate* for him to say that the SDNY complaint would eventually go public "lawfully and legally" when Sater himself publicly disseminated the *Kriss I* complaint. At the very least, appellants should have been permitted to call Sater to testify so he could be cross examined on the issue of his perceived risk.

---

[5] The *Kriss I* complaint that Sater filed in Israel, at a time that it was sealed in the SDNY, https://www.scribd.com/doc/276067901/Felix-Sater-Tel-Aviv-Exhibit

### iii.    The 2010 Order to Show Cause and Related Proceedings

As Sater's name was clearly stated in open court at the June 11th hearing before Judge Glasser (see ECF 13-6), no power of any American court could be (nor was it) invoked to bar anyone who was in that courtroom (including the attorneys) from telling anyone that Sater was the defendant in the 98-cr-1101 case. "What transpires in the court room is public property.... Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government to suppress, edit, or censor events which transpire in proceedings before it." *Craig v. Harney*, 331 U.S. at 374. That should have ended it all, pursuant to *Chase Nat. Bank v. Norwalk*, 291 U.S. 431 (1934), and *Alemite Mfg. v. Staff*, 42 F.2d 832 (2d Cir. 1930).

The Committee said of the June 14th hearing: "Judge Glasser emphasized that Sater's case had been under seal since its inception, that the documents in the file stated explicitly that they were sealed, and that [Oberlander] was aware that the documents were sealed." (ECF 26, Grievance order, p. 7). Judge Glasser did say on June 14 that "[t]his case was filed under seal from the very first day it came into this courthouse. You can't look at the docket sheet on ECF because it's sealed." (ECF 13-9, Glasser transcript, June 14, 2010, p. 6:13-15.) He *also* said that having looked at the docket:

I saw *about six docket entries which said these documents have been docketed under seal.* They were docket numbers five through eight, eleven, thirteen, sixteen and seventeen. Filed under seal. I don't know as I talk to you what those documents say. I undoubtedly knew about it at the time because a copy of it must have been provided to me. And *to the extent that I agree* that it should be filed under seal *I tacitly, implicitly ordered it.* (*Id.* at 6:20-7:3.)

Judge Glasser also candidly explained at the June 14th hearing that "*there is no formal order* which I believe is not issued by virtually any judge in this courthouse with respect to sealing." (*Id.* at 5:6-9). Judge Glasser explained his view that sealing "orders" (even tacit or implicit ones) bind non-parties who receive materials from extra-judicial sources, so "[t]here's no order that needs to be addressed to Mr. Oberlander and say, Mr. Oberlander this is a sealed document, don't publicize it," and "when your letter asks me to show you **what order is directed to Mr. Oberlander, there isn't any**." (*Id.* at 8:2-4; 9:2-3).

Despite saying that the case had been "filed under seal" since its first day, Judge Glasser *also* acknowledged that there was no formal court order, that the docket reflected only six or so documents as being filed under seal (rather than every document), that he "tacitly, implicitly" ordered documents sealed, and that there was no order directed to Mr. Oberlander. Judge Glasser's belief that a sealing order, if it had been issued, could have bound non-parties was pure dictum, and contrary to clear and binding Supreme Court and Second Circuit precedent. (See ECF 13-9, Glasser transcript, June 14, 2010, pp. 5-6).

Further, while Judge Glasser stated at the June 14, 2010 hearing, "Now, as I read what was annexed to that complaint, there's no doubt that Mr. Oberlander was aware of the fact that these documents were sealed ECF 26" (*id*. at 7:25-8:2), yet he made this statement a week before the actual evidentiary hearing on June 21, when Oberlander actually testified, and the documents were put into evidence, and showed that none had any markings indicating "sealed."

Judge Glasser's statement was not a "finding" after an evidentiary hearing or even made pertaining to any order that Glasser was issuing; the statement was simply a judge's musings on the record. And it turns out, Judge Glasser acknowledged a year later on April 27, 2011 (during the pendency of the appeal) that in his thirty years on the bench he never signed sealing orders, but simply said "so ordered" upon request. As they weren't sealed, Oberlander couldn't "know" they were sealed ECF 26. Epistemology 101.

That too should have ended it, because without the requisite findings supportive of sealing having even being made, there could not have been a lawful sealing order. As Sater's case was never lawfully sealed, it was not sealed, and the failure to properly seal cannot, lawfully, be retroactively rectified by some post hoc order. *ABC, Inc. v. Stewart*, 360 F. 3d 90, 102 (2d Cir. 2004) ("the government's after-the-fact rationalization is…insufficient to overcome the presumption of openness. Under the procedure established in *Press-Enterprise* I and the

20

subsequent right of access cases, closure may not be retroactively validated.") (Citations and internal quote omitted).

Again, it's a matter of Epistemology 101. Oberlander could not have "known" that the documents were sealed, because he had no evidence that they were sealed, there were no markings showing they were sealed, he'd seen no sealing order, and in fact, as Judge Glasser "admitted," they were not sealed. Thus, Oberlander quite logically "refused to admit that he knew they were sealed."

The Committee's statement that Oberlander "refused to admit that he knew [the proffer and cooperation agreement] were sealed" is an example of its viewing anything Oberlander said in the most unfavorable light. Obviously, there is, at the very most, a dispute as to both what was actually sealed and as to Oberlander's knowledge regarding it. And it is quite captious to suggest that Oberlander could have known that these documents were "sealed," because Judge Glasser himself told the Supreme Court in 2013 that neither the proffer nor the cooperation had even been filed with the court, and thus that they were not under court seal.

Notably, the questioning did not even specifically concern the allegedly "sealed materials" or Sater's criminal documents, but just generally documents from Bayrock. While the Committee contends that this is an undisputed record, yet again the Committee appears to find that Oberlander had knowledge of something based on his alleged "refus[al] to acknowledge that he knew" it—when there were

no findings by Judge Glasser ECF 15-21 ECF 14-27 (who actually heard the

testimony) on this point and the Committee did not itself hold an evidentiary

hearing but instead ruled on a paper record.

Sater's counsel also asked Oberlander about an email that he had sent to Ron

Kriss, the father of Jody Kriss. The email, which had the *Kriss I* complaint attached

to it, stated and then Oberlander was asked as follows:

> Ron--
>
> I recommend you forward this to Julius [meaning Julius Schwartz, member and General Counsel of Bayrock] with the comment from me that there are three alternatives here:
>
> I file publicly today.
>
> I file under seal today.
>
> He arrange a tolling agreement with EVERY defendant but Nixon Peabody.
>
> I don't care how many people he has to get on the phone and how fast he has to work. He had years to give back the money and now it's over. He can get Brian Halberg to help him.
>
> I believe it's possible to get this in under seal if Bayrock joins in a joint motion in part 1 to seal the complaint pending a redaction agreement with the assigned judge but there are never any guarantees.
>
> Thanks,
>
> FMO
>
> Q: And in this email you basically say there's three options or pay the money back now; is that right?
>
> A: No.
>
> Q: Give the money back and now it is over. What is the meaning of that?
>
> A: It means Julius Schwartz personally in conspiracy with other people, including Mr. Doe, stole in cash equivalent about eight million dollars from my clients in terms of value of the partnership interest, they converted about $30 million, probably tens of millions of dollars, depending on the analysis

from the Treasuries of New York State, New Jersey, and the United States, and I don't know how many millions from people they defrauded when they were buying condominiums and that they had plenty of time to rectify their theft, embezzlement, larceny, fraud and tax evasion....

A. You are.

Q. It was not your intent to make it a demand for money in exchange for not filing it publicly?

A. Of course it wasn't.

At the conclusion of Oberlander's testimony, Lerner objected to Sater's counsel's characterization of the documents as having been stolen, and Judge Glasser stated:

> Let me clarify some things. There is no evidence other than the fact that Mr. Oberlander received these documents from Mr. Bernstein. Mr. Bernstein, according to Mr. Oberlander, represented to him he got [the] documents because Mr. Doe [Sater] gave them to him. I haven't heard any evidence one way or the other with respect to that information [as to whether they were actually stolen]. *Id*. at 87:21-88:1.

That is, the permanent injunction as to the PSR was issued not because of anything Oberlander (or Bernstein) did or didn't do. It was irrelevant how Bernstein and then Oberlander came into possession of the documents. Thus, any discussion whatsoever as to what Bernstein or Oberlander knew or didn't know, or did or didn't do, was dictum (and could not be relied on by the Committee). Judge Glasser's permanent injunction was in rem, as to the document itself, his belief clearly being that if anyone comes into possession of a PSR—whether he be a non-party to the criminal proceeding, whether he be an attorney, whether he be a New

York Times reporter, whether he be anyone in the world—he believed that a PSR

falls outside the ambit of *Chase Nat. Bank v. Norwalk*, *Alemite*, and *Bridge CAT

Scan*, [6] and anyone who receives, regardless of how, can be ordered to return it.

Sater then testified, and as the Committee summarized, Sater "said that he

kept the Sealed Materials in a personal file labeled 'Personal and Confidential,' in

a locked drawer in his desk. He did not give the Sealed Materials to Bernstein, and

had not scanned or asked anyone to scan the Sealed Materials." (ECF 26, p. 9). But

Sater himself acknowledged that the documents were not "sealed" when

questioned by Lerner: "*Q.* When you said you had these documents and referring

to the purportedly sealed and confidential documents -- *A.* ***I didn't say they were

sealed*** and confidential. I said the folder was marked personal and confidential."

(ECF 13-10, at 106).

The Committee also omitted that Sater testified that he "may have had an

electronic version of those documents" and that it was "possible those electronic

versions of the documents made it onto the email server [he] asked Mr. Bernstein

to copy through this hard drive." (ECF 13-10, pp. 101:6-16, 105:8-10).

---

[6] In *Bridge CAT Scan Associates v. Technicare Corp.*, 710 F. 2d 940, 946 (2d Cir.
1983), this Court held that documents obtained outside of court process are beyond
the jurisdictional power of the court to restrain.

Judge Glasser then extended the TRO, with Lerner's consent, as to the non-PSR documents, indicating Glasser's desire for further briefing as to whether he could enjoin their dissemination. (*Id.* at 112:9-115:24). On July 16, 2010, Lerner filed an "Opposition to All Relief in the OTSC," asserting Oberlander's First Amendment rights. Attached thereto was a declaration of Oberlander in which he objected to the court's original May 18, 2010, TRO. (ECF 13-13). In the declaration, Oberlander stated that the TRO was "a patently unconstitutional prior restraint" that enjoined him "from disseminating truthful information, lawfully obtained, of public concern," and that the court had issued it "without notice and a hearing," "undocketed and under seal," and based on an *ex parte* petition from Sater's lawyers. (*Id.* at ¶ 1). Oberlander characterized the court in proceeding in such a manner as "sitting as a star chamber," (*id.*) and used some zealous language in the introductory section, including quoting the words of Joseph N. Welch to Joseph McCarthy, "You have done enough. Have you no sense of decency sir, at long last?" (*id.* at ¶ 20), and contrasting the signers of the Declaration of Independence (whom he says made their proclamation "publicly"), with "[t]his court," which "hides what it does," out of "pusillanimous fear." (*id.* at ¶4-5).

Overarchingly, Oberlander's declaration was clearly aimed at challenging Judge Glasser's constitutional authority (1) to adjudicate criminal cases, like Sater's, in a "super sealed" manner where the entire case is hidden from public

view, including the docket itself; (2) to hide such cases without the issuance of a formal order, a hearing, or findings; (3) to issue prior restraints against persons who learn about such a hidden case or obtain possession of documents from such a case outside of court processes (in Oberlander's case as a passive recipient of documents)—prohibiting such persons from disseminating any information contained in the hidden documents or case and threatening them with contempt or other sanctions for violating the prior restraints; and (4) issuing such prior restraint without "on-the-record findings" in proceedings that are themselves conducted as part of the undocketed case (98cr1101) that is hidden from public view.

The Committee stated that Oberlander's declaration "signaled his intent to ignore the court's orders" because he said "I will not be silenced" and that there was "nothing the court can do to me." (Oberlander Order of August 13, 2018, at 10). But the context for both statements indicates that Oberlander was not saying he would disobey court orders, but that he would vehemently contest their legality. He noted that Business Week had previously published an article revealing information from Sater's case, but that there was "nothing, constitutionally, that the court can do" about Business Week's article, and, similarly, "there is nothing the court can do to me." In other words, members of the public—which includes attorneys—have the same First Amendment rights as do the media (see *Citizens United v. FEC*, 558 U.S. 310 (2010)). Oberlander never indicated that he intended

to disobey court orders, but signaled that he would contest their constitutionality and legality through legal processes, including by filing the very declaration at issue.

He did not elucidate what the "further TRO" restrained, but one thing that is clear is that (a) a TRO preserves the status quo and thus could not have been a directive to destroy or return documents, and (b) a TRO expires after fourteen days unless extended by agreement or by a further order of the court "for good cause," as FRCP 65(b)(2) makes clear.

The Committee quotes portions of two demand letters sent by Oberlander to Morgan Lewis attorneys on October 18 and November 9, 2010, which letters the Committee relies on as "[t]he evidence" in finding that Oberlander engaged in attempted larceny by extortion ECF 34 under New York's penal law, forming a primary basis for discipline. (Oberlander Order of August 13, 2018, at 36-38).

Appellants were never charged with extortion of any kind, and were denied their due process rights to know of the charges and to be heard. Appellants would have proffered evidence regarding the circumstances of these demand letters, including other emailed communications and settlement letters between counsel and the fact that Oberlander had other attorneys besides Lerner review the October and November letters, including a noted First Amendment attorney (David Schulz) and a former federal judge (Paul Cassell) before he sent them to opposing counsel.

Notably, an additional formal letter was sent to Sater's counsel on August 17, 2010 (which appellants would have been proffered to the Committee had they known that they were being charged with extortion on the basis of the demand letters). In the August letter, Oberlander explains that he was working on the redacted complaint and to assist with settlement he was willing "to redact from the Complaint all allegations of cooperation but leave in non-inflammatory allegations of the conviction." He further notes that, nevertheless, he had figured out from public sources that Sater was a cooperator prior to receiving the documents from Bernstein and had included such allegations in drafts of the *Kriss I* complaint predating his receipt of any documents from Bernstein. He also points out that any settlement would need to be approved by Judge Buchwald per FRCP 23.1, since *Kriss I* was a derivative action. Because extortion was not charged in the OTSCs, this letter was not submitted to the Committee. (It will be provided to the Court upon request).

The Committee found that through the October and November letters, Oberlander "continued to demand money from Sater ECF 34 and the other defendants...and threatened to disseminate the sealed information if [they] did not agree to a monetary settlement ECF 26 ECF 26 ECF 26." (Oberlander Order, at 12). But, of course, the purpose of the standstill period was that both parties had agreed to negotiate with a view towards settlement, so naturally, as plaintiffs'

28

counsel, Oberlander would "demand" money to reach a settlement. Each of the letters is captioned a "Communication in Contemplation of Settlement."

Further, the Committee omits some very important portions of the letters that it did review. Most notably, the October 18 letter had attached to it, which attachment was submitted to the Committee, a proposed redacted complaint. In fact, the second heading of the letter is "The Standstill Agreement and Redacted Complaint," and Oberlander explains:

> The **attached redacted 'complaint'** is for immediate dissemination, not service, upon all defendants to incent them into settlement discussions *without the necessity for blowing this all up publicly*. First, *allegations which quote from or describe the contents of the PSR, complaint, proffer, information, or cooperation agreement will be blacked out in standard redaction typeface*. For your review they are shown now as strike-through gray highlighted font.

ECF 13-22, p.3, letter to Morgan Lewis (emphasis added).

Omitting the fact that a redacted complaint was attached, the Committee then quotes the following from the letter: "[M]y clients...simply demand for [sic] what they are entitled to: one billion dimes....At this time, plaintiffs will favorably consider settling the entirety of all claims known and unknown for their actual damages of $35,000,000....It is the least amount which plaintiffs would be willing to accept for a quick settlement that avoids the dissemination." (ECF 26, p. 12).

The Committee omitted that the first page of the letter explains the calculation of damages, the legal basis for the $35,000,000 actual damage figure,

the legal entitlement to trebling pursuant to 18 U.S.C. §1964(c), which raises the

amount to $105,000,000, and cites to caselaw supporting this assessment. The

letter also offers to provide a precise calculation of damages on request. (ECF 13-

22, p.1, letter to Morgan Lewis). Finally, as to the Committee's quotation, they

omitted the bolded portions from the following text:

> **I remind you** my clients *are **not** interested in one dime they are not entitled to by law* **and this is <u>no</u> extortion or improper threat. They** simply demand for what they are entitled to: one billion dimes. At this time, plaintiffs will very favorably consider settling the entirety of all claims known and unknown for their actual damages of $35,000,000. **This is not an offer at common law or for purposes of FRCP 68.** It is the least amount which plaintiffs would be willing to accept for a quick settlement that avoids the dissemination. **Please note this or any settlement may be subject to judicial approval.**

*Id.* at 6 & n.3.

As to the November letter, appellants were unaware that there would be a

charge of attempted larceny by extortion (against Oberlander), and against Lerner

of somehow joining in on the attempt. Appellants were therefore unable to

establish the context for the second letter, although pieces of it are implied in the

letter's text.

This was not a "threat to disseminate [] sealed information" as the

Committee stated (ECF 26, p. 12) or to disobey court orders. Oberlander was

stating that dissemination will occur because the courts will unseal it and "order

[this] public." (ECF 13-22, p. 1). He anticipated the following:

> If this case is not settled quickly, it will surely go viral. If you obstruct a settlement instead of helping get there, everything will go public with clockwork inevitability. This is not a threat, it is mathematics. And it is certain. No power on this earth will much longer prevent as much lawful and legal worldwide dissemination of the Complaint and every document attached thereto or referenced therein as the public and the press doing the dissemination think its value justifies. You already saw what Courthouse News thought of it, and everything else I file about Bayrock, entirely without my or my clients' involvement. Only a stipulated sealed confidential settlement agreement Plaintiffs find acceptable, executed very soon, can stop that.

*Id*. at 2.

Of course Oberlander was correct, as Judge Glasser surely understood that a court order (whether labeled "sealing order" or otherwise) could not gag non-parties, such as Oberlander and his clients, who had neither notice nor an opportunity to be heard at the time the order was issued. See *Carroll v. President and Comm'rs of Princess Anne*, 393 U.S. 175 (1968). Oberlander was not a party to the U.S. v. Sater action, so, as Judge Glasser asked rhetorically, "what order was violated?" (ECF 13-17, at 20:15-24). The answer is, and remains, none. Obviously.

Oberlander had filed interlocutory appeals as to the permanent injunction as to the PSR, the various TROs as to the non-PSR documents, and the March scheduling order. On January 26, 2011, the government moved for a "temporary" stay of the unsealing of the appellate docket and "of the materials placed under seal by Judge Glasser pending the appeal of this matter."

On February 10, 2011, the Second Circuit issued an order that "temporarily enjoined" all parties from disseminating "any documents filed in this appeal" or filed in the EDNY or the SDNY. (ECF 14-2, Second Circuit Order, p. 2, ¶ 4). The Court then stated:

> To the extent that respondent appellant Richard Roe and his counsel 'believe [they have] always been and always [will] be free to distribute [the Court's] order[s] and the filings in this appeal...to Congress and the public...and the media...they are mistaken." (*Id*.).
> A year later, on February 5, 2012 – *after* the Second Circuit's "temporary"

injunction had expired on December 20, 2011 by issuance of its mandate closing the case – the *New York Times* published a story, "By Revealing Man's Past, Lawyer Tests Court Secrecy," written by Benjamin Weiser. The article states that Richard Roe is Frederick Oberlander, and includes a photo of Lerner and Oberlander. The article does not reveal Sater's identity, but refers to him as "John Doe" throughout.

Further, the article states that "Details of the dispute between John Doe and Richard Roe were pieced together through a review of public documents" and that "Mr. Oberlander agreed to be interviewed although ***he would not discuss sealed aspects of the case***." As detailed in Tarkington's report ECF 91 at 66, the identity of Oberlander as Roe was already public due to this Court's public June 29, 2011 order and a public filing made by Sater's Counsel in *Kriss I*, which cross-referenced the EDNY 98-cr-1101 case.

On February 10, 2012, Sater's counsel moved via unsworn letter before Judge Cogan to hold appellants in contempt for allegedly revealing that Oberlander was Richard Roe. (ECF 15-3). Cogan then issued an OTSC why Lerner and Oberlander should not be held in civil contempt for violating the Second Circuit's February 14, 2011, summary order. (ECF 15-4, OTSC Signed by Cogan). On February 17, 2012, appellants filed a motion to quash the OTSC. (ECF 15-5).

The Committee quotes zealous language from the motion to quash, but the language is shorn of the context or the explanations of the terms given in the motion. Lerner and Oberlander argued—and the Committee found no error in the argument—that the rules required that the OTSC be supported by a sworn affidavit, that it was Sater's counsel who revealed Oberlander's identity as Roe through public filings, and that the court lacked authority to adjudicate criminal contempt of the orders of another court. (*Id.* at 4-7). Further, they argued—and the Committee found no error in the argument—that to the extent the contempt was civil, the unconstitutionality of the underlying gag orders would be a defense.

They also argued—and again the Committee found no error in the argument—that the hiding of entire criminal cases, like Sater's, is unconstitutional and unlawfully evades Congressional sentencing laws like the MVRA and the CVRA, relying on the United States Supreme Court's case, *Ex Parte United States*, 242 U.S. 27 (1916); and *Dolan v. United States*, 590 U.S. 605 (2010). (*Id.* at 8).

33

Appellants argued—and again the Committee found no error in the argument—that such problems were compounded by Judge Glasser's and the Second Circuit's temporary injunctions against Oberlander to not reveal any of this information—even to Congress. (*Id.* at 9).

Indeed, Oberlander was threatened with contempt if he revealed anything regarding Sater's hidden case (and, in fact, Cogan had now issued an OTSC why Oberlander shouldn't be held in contempt for allegedly revealing his own name). Yet the Committee found no error in the argument contained in the motion that the Second Circuit's orders were unconstitutional and were issued for an,

> unconstitutional purpose, that is, concealment of systemic judicial and executive branch lawlessness. We will contend that such lawlessness has been deemed to fall within the scope of the term 'sedition' (see addendum), such sedition constituting high crimes and misdemeanors, including the conspiracy to and actual accomplishment of the falsification of judicial records and repudiation of mandatory sentencing and victims rights laws." (*Id.* at 8.)

The cited addendum—in which the Committee found no error—explained that the term "sedition" was used in the sense understood by the Founders (and "disclaim[ing] any statutory criminal interpretation") to refer to a *political* crime or maladministration in office—here, specifically, "Federal judges cannot operate in secret, alone or in combination with probation officers and officials of the Department of Justice, to evade mandatory restitution laws or any other mandatory sentencing laws. It's seditious." (*Id.* at 17.) Presumably, the Committee found no fault in the argument because it is so foundational to our values, and consistent

with the *Framers'* Blackstonian understanding of the word "sedition," though the word has taken on a different sense in modern times.

Appellants also argued that they had a right to a public hearing for the contempt (especially if criminal) and demanded that Cogan proceed on a separate docket, as all of the proceedings against Oberlander—whether conducted by Glasser or Cogan—had been held on Sater's "blanket sealed" and publicly unavailable docket for Sater's 1998 criminal case.

As discussed above, and as the U.S. Supreme Court's docket shows, Lerner attempted to file the petition under seal, but was told by the Supreme Court that he needed to move to file it under seal and include a redacted version that could be filed publicly. Lerner filed such a motion (see link[7]), which expressly told the Supreme Court that the Second Circuit had ordered that any appeal be filed under seal, and outlined what information was not redacted in the proposed public redacted petition, including information from the PSR. As further shown above, the Supreme Court ordered only that the parties' names and identifying information be redacted, and then issued an order approving Lerner's redactions of only such information, the order stating that Lerner was in compliance. (See link to SCOTUS docket[8]).

---

[7] https://img1.wsimg.com/blobby/go/d0316799-14e9-4152-92f4-d4a5f1205f42/downloads/SCOTUS_package.pdf?ver=1632154484001
[8] https://img1.wsimg.com/blobby/go/d0316799-14e9-4152-92f4-d4a5f1205f42/downloads/SCOTUS_package.pdf?ver=1632154484001

Included in the motion and the petition for cert was a great deal of other information that came directly from the PSR, which the Supreme Court allowed to go public, along with the fact that "Doe" and the government had entered into a cooperation agreement, and so the redacted cert petition and the motion to allow its publication became publicly available, by approval of the Supreme Court, on July 13, 2012. (See link to SCOTUS docket[9] and motion and cert petition at link[10]).

It was not until the documents on Judge Glasser's hitherto secret Doe/Sater docket themselves were unsealed, some of them not until after Committee issued its 2018 orders against appellants, that it was learned that (a) during *ex parte* conferences, Judge Glasser, the government, Sater's counsel and Sater himself had discussed the merits of Oberlander's RICO complaint filed on behalf of his clients Kriss and Ejekam against Sater and others, and had discussed Oberlander's First Amendment arguments as to his clients' right to use the documents at issue, and (b) that the government had secretly withdrawn its motion to unseal Sater's case, which motion had been predicated upon the lack of any known risk to Sater, and notwithstanding that this Court had remanded the case to Judge Glasser in its June 29, 2011 decision to take up and decide the government's motion to unseal Sater's case.

---

[9] https://www.supremecourt.gov/search.aspx?filename=/docketfiles/12-112.htm
[10] https://img1.wsimg.com/blobby/go/d0316799-14e9-4152-92f4-d4a5f1205f42/downloads/SCOTUS_package.pdf?ver=1632154484001

After the "inadvertent" unsealing of Judge Glasser's Doe/Sater docket sometime in mid-August 2012, and after he issued an order on August 27, 2012 formally unsealing the docket, Judge Glasser held a hearing as to whether to unseal the underlying documents on Sater's docket. Lerner, Oberlander and members of the media arrived for the hearing, only to have Glasser order everyone (other than the government and Sater) out of the court and have the courtroom closed for the hearing, not even allowing Lerner and Oberlander to appear or make arguments.

Without others to counter their presentation, Sater's lawyer was allowed to argue *ex parte* in a closed courtroom that sealing was necessary to protect Sater's safety, the only interest still at stake, according to Glasser at the August 22 hearing. (ECF 15-15, at 22:11-16).

Sater's lawyers had filed papers with Judge Cogan on August 2, 2012, stating that Daniel Persico had assaulted Lauria and threatened to kill Sater in July 2012 because Persico had allegedly just learned that Sater had been a cooperating witness against him. Sater's lawyers claimed that Persico had gained this knowledge because Oberlander had disclosed sealed materials to attorney Gerald Shargel, who had allegedly represented Persico in the Coppa case.

Oberlander filed an omnibus motion reviewing (a) the recently uncovered docketed *ex parte* communications (and asked for a disclosure of all *ex parte* communications), (b) an email from Sater's counsel Nader Mobargha email stating

that Glasser would adjudicate unsealing docket entries "without considering your arguments or appeals," (c) the closing of the unsealing hearings, (d) the history of the prior restraint/gag orders, and the (e) the initial "sealing" without orders. The motion stated:

> The same accumulation of events also makes inarguable that your honor presides over this and related matters in violation of 28 U.S.C. §455(a) and (b)(1), having failed to disqualify yourself despite Congressional mandate you do so because of, respectively, [1] your appearance of bias and lack of impartiality, palpably obvious to, let alone reasonably questioned by, an objective, informed observer; and (2) your knowledge of disputed evidentiary facts you obtained outside this proceeding, or *ex parte*, a fortiori facts which you have wrongfully withheld from us.
>
> Now, given what must appear to that objective observer to be intentionally chilling, retributive, in terrorem threats to sanction us for exercising our First and Fifth Amendment rights—rights no court may deny—to introduce relevant evidence in support of meritorious argument and in particular in light of the documentary evidence we now proffer, that observer cannot rationally conclude but that your honor appears to be in criminal conspiracy with at least Nader Mobargha and Michael Beys, Sater's lawyers, to deprive us and our clients of our rights.

(ECF 15-22, at 2).

Further, the Committee then lists numerous statements from the Omnibus motion and a supplemental brief filed in response to Glasser's §1927 Sanctions OTSC (everything quoted on pages 20-22 after the first two bullets on page 20), none of which were contained in the disciplinary charges against either appellant, and which they did not have the opportunity to respond to in any manner.

Because the statements on pages 21-22 and most on page 20 of the August 13, 2018 orders were not listed in the disciplinary charges, appellants were unable to respond to them at any level. For example, they could not point out that the quotation regarding the Second Circuit's decision was not about any decision this Court rendered in Sater's case, but instead about the overarching history of sealing cooperators' cases in the Second Circuit. The full quote is: "As to sealing and closure, this hit its nadir (we hardly call it a zenith) of lawlessness with the Second Circuit's decision in U.S. v. Doe 63 F.3d 121 (2d Cir. 1995), wherein the court circumvented *Press Enterprise* and the entire *Richmond* line of constitutional access jurisprudence."

With the Committee's omissions, the quote appears to be talking about the Second Circuit's June 29, 2011 summary order ECF 15-4 adverse to Oberlander, but it is instead attacking the constitutionality of a specific precedent that has been used to circumvent Press Enterprise.

After appellants' submission to Judge Glasser, he dropped it, never ruling on his own OTSC, presumably convinced by the arguments that the documents submitted with the request for admission were entirely appropriate. Not only did Judge Glasser find no legal error with respect to the critiques—particularly as to the Second Circuit's 1995 decision in *U.S. v. Doe* being an unconstitutional

circumvention of *Press Enterprise* and the *Richmond* line of cases—neither did the Committee find error.

The Committee also entirely omitted what occurred in the Supreme Court as to Oberlander's appeal. On September 20, 2012, the U.S. Supreme Court requested that the government file a response to Oberlander's petition for cert. On February 21, 2013, the Solicitor General's office filed a response, the leading argument thereof was that Oberlander's appeal had been largely mooted by Glasser's unsealing of Sater's docket. Paul Clement, former Solicitor General of the United States, joined with Lerner on the reply brief that was filed on behalf of Oberlander on March 5, 2013. The brief stated:

> The courts below have not only sanctioned an entirely secret criminal proceeding, but have treated the secret proceeding as a self-executing injunction against the world that precludes Roe [Oberlander] from disclosing it as part of an effort to vindicate his clients' rights through civil litigation. And the government considers Roe's actions as tantamount to contempt, even though it cannot identify any court order that Roe actually violated. Roe was not even a party to the secret criminal proceedings and did nothing more than what lawyers are supposed to do when they uncover evidence of misconduct.
>
> This is all a remarkable, flagrant affront to the First Amendment's guarantee of the freedom of expression, and a stark departure from this Court's longstanding jurisprudence.

(ECF 16-1, at 2-3).

The Committee didn't even mention Judge Glasser's March 13 and 14, 2013, orders, failing to recognize the significance of Judge Glasser's admission

that the proffers and cooperation agreement were never sealed, manifestly because

it would constitute an acknowledgement that Oberlander was right all along.

Manifestly, the Committee did not discuss it, because it showed that Judge Glasser

had erred (to be charitable) when he said in his March 23, 2011 "scheduling order"

that he must have issued a sealing order that Oberlander "flouted" by unilaterally

determining that, even if there were such an order ECF 26, it could not have

applied to him.

On June 9, 2014, Sater's counsel filed an unsworn disciplinary complaint

against Oberlander, and on July 23, 2014, filed an unsworn disciplinary complaint

against Lerner. Nearly two and a half years later, on November 18, 2016, the

Committee filed a "Sealed Order to Show Cause with Statement of Charges"

against Lerner and Oberlander.

On June 14, 2024 the Committee issued further orders, suspending Lerner

(ECF 75) and Oberlander for an additional year. Motions for reconsideration were

thereafter timely filed and denied on September 4, 2024 (ECF 78).

## Argument

**Point I:     The Committee Denied Appellants Their Due Process
                  Rights.**

### A.     Grievance Proceedings Require Due Process.

"[A] court's disciplinary proceeding against a member of its bar is

comparable to a criminal rather than to a civil proceeding." *In re Peters*, 642 F.3d

381 (2d Cir. 2011) (citations omitted); see also *In re Ruffalo*, 390 U.S. 544, 551 (1968). As this Court explained, "Because an attorney disciplinary proceeding is quasi-criminal in nature, the Due Process Clause entitles the charged attorney to, inter alia, adequate advance notice of the charges, and the opportunity to effectively respond to the charges and confront and cross-examine witnesses." *Peters*, 642 F.3d at 385.

**B.      The *Mathews v. Eldridge* Balancing Test in Disciplinary Contexts.**

Beyond the foundational notice requirements of *Ruffalo*, the specific procedures necessary to satisfy due process in any given administrative or quasi-judicial context are typically analyzed under the three-factor balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976). This test requires consideration of:

1. The private interest that will be affected by the official action.
2. The risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.
3. The government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Applying *Mathews* to attorney discipline reveals the significant interests at stake. The attorney's private interest is profound, involving his livelihood, professional reputation, and ability to practice his chosen profession. The risk of

erroneous deprivation can be substantial, particularly in complex cases involving

disputed facts, intent, and the application of potentially vague ethical standards.

The government's interest in protecting the public, maintaining the integrity of the

bar, and ensuring the proper administration of justice is also significant. However,

the *Mathews* balance is context-dependent. Here, the Committee made findings

equivalent to criminal felonies, dramatically shifting this balance. The private

interest affected escalates beyond the loss of a license; it includes the imposition of

a severe, public stigma akin to that associated with a criminal conviction,

potentially precluding future employment in numerous fields and causing

devastating personal and professional consequences. Concurrently, the risk of

erroneous deprivation becomes intolerably high if the procedures used are merely

the "flexible" ones suited for minor ethical infractions.

Findings of conduct amounting to extortion or attempted murder require

complex factual determinations, assessments as to mens rea, and the application of

standards (here, allegedly state criminal law) far removed from typical ethical

rules. Using less rigorous procedures significantly increases the likelihood of a

mistaken finding with catastrophic consequences. While the government's interest

in bar integrity remains, it cannot justify using inadequate procedures to impose

sanctions based on findings of such magnitude. The probable value of additional

safeguards—such as a higher standard of proof (clear and convincing evidence, or

even beyond a reasonable doubt), stricter rules of evidence, enhanced rights to confrontation and cross-examination, and potentially bifurcated proceedings for factual findings versus sanctions—becomes immense when the findings carry the weight of serious felonies.

C. **Heightened Due Process for Severe, Stigmatizing Findings: "Felony-Equivalent" Findings and 'Stigma-Plus' Doctrine.**

The extreme nature of the alleged findings triggers concerns beyond the standard *Mathews* analysis, potentially implicating the "stigma-plus" doctrine and demanding procedural protections approaching those required in criminal proceedings. The "stigma-plus" doctrine, originating from *Paul v. Davis*, 424 U.S. 693 (1976), holds that while reputational harm alone caused by government action does not constitute a deprivation of liberty, such harm coupled with the alteration or extinguishment of a more tangible legal right or status (the "plus" factor) does require heightened due process.

Here, the "plus" factor is clearly present: the potential or actual deprivation of attorneys' licenses to practice law. The critical question is the severity of the "stigma." Findings that an attorney's conduct was equivalent to extortion and potentially attempted murder under state criminal law standards inflict a degree of public disgrace and condemnation far exceeding typical disciplinary findings (*e.g.*, neglect, commingling funds, lack of diligence). This level of stigma is comparable to, if not indistinguishable from, that associated with a formal criminal conviction

for those same felonies. Such severe, officially pronounced stigma, combined with the loss of the right to practice law, constitutes a quintessential "stigma-plus" scenario.

This situation necessitates procedural safeguards significantly more robust than those deemed sufficient for lesser disciplinary matters. The gravity of the potential deprivation—both reputational and professional—mirrors that addressed in cases like *Goldberg v. Kelly*, 397 U.S. 254 (1970), which mandated trial-type hearings before the termination of welfare benefits due to the critical nature of the interest involved. When a disciplinary body makes findings that brand an attorney with the functional equivalent of a serious felony conviction, the required process must reflect the magnitude of that determination. This implies a need for procedures that minimize the risk of error, potentially including a standard of proof higher than a mere preponderance of the evidence (likely clear and convincing evidence, the standard in many jurisdictions for serious sanctions, or arguably even beyond a reasonable doubt given the criminal nature of the findings), stricter adherence to rules of evidence, and full rights of confrontation and cross-examination regarding the specific elements of the state criminal offenses allegedly used as standards.

The characterization of the conduct as equivalent to serious felonies is not merely semantic; it fundamentally alters the nature of the proceeding and the

process constitutionally due. Standard disciplinary procedures, even if adequate for typical ethical violations under *Ruffalo* and *Mathews*, become constitutionally suspect when used to adjudicate conduct framed in terms of serious criminal offenses carrying immense stigma and potentially career-ending consequences.

Here, given the "stigma-plus," appellants were entitled to—but did not receive—any such procedural safeguards, and therefore the case must be remanded for a full evidentiary hearing, if not dismissed entirely.

D. **Due Process Required that the Committee Identify the Orders Appellants Allegedly Knew They Would be Violating, their Decretal Language, and the Specific Acts that Allegedly Contravened Them.**

The Supreme Court explained that "[c]ertain principles [of Due Process] have remained relatively immutable in our jurisprudence." Specifically, that "where governmental action seriously injures an individual" and relies on factual findings "the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue" or to otherwise contest it, a core principle grounded in the Sixth Amendment and both the confrontation and cross-examination clauses. *Greene v. McElroy*, 360 U.S. 474, 496 (1959).

This basic due process premise underlies Rule 65's requirements, which this Court has said are "satisfied only if the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden." *Fonar Corp. v. Deccaid*

*Services*, 983 F. 2d 427, 429 (2d Cir. 1993). The Supreme Court has explained, "One basic principle built into Rule 65 is that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits." *Granny Goose Foods v. Brotherhood of Teamsters*, 415 U.S. 423, 444-45 (1974).

The Committee's finding does not identify the orders, let alone their decretal language, but merely states that the orders that Oberlander "knew" he would be violating are "explicit." Yet the only possible court orders in existence in October and November 2010 were (1) the so-ordered standstill agreement that expressly allowed Oberlander to retain copies but not disseminate the documents at issue, which agreement was also expressly terminable at the will of either party, and was actually terminated by Oberlander's November letter (see ECF 13-20 and ECF 14-14), and (2) Judge Glasser's oral permanent injunction against dissemination of the PSR.

If the Committee was referring to Judge Glasser's alleged original sealing order, appellants have a due process right to see this order and its decretal language. Yet this order has never been produced or docketed. Additionally, the Stephanie Mark letter confirms that Sater's file was sent to the National Archives unsealed, was thereby made public by the EDNY itself, and was immediately made

available to the public by NARA. Thus, if the case ever was "sealed," it no longer was, as of 2004.

What then is the basis—the evidence—for the Committee finding that there was such a threat of harm to Sater at that time, and that Oberlander (but not the government, even after a formal threat assessment) somehow "knew" as much? Appellants have a due process right to know the evidence on which the Committee relied to prove its case, and to have an opportunity to contest and cross-examine it.

The submissions from appellants demonstrated that there was no threat of harm to Sater, as the co-conspirators against whom Sater testified were fully aware of his identity a decade earlier. This is truly undisputed. (See ECF 24, Giannini Aff. ¶¶ 7-12, and attachments thereto; ECF 15-19, 1-2). And the government itself moved to unseal the Sater case after Lerner showed AUSA Kaminsky that the government itself "outed" Sater as a cooperator in a 2000 press release that can be found in the Congressional Record. [11]

Additionally, the Committee found that various assertions derogating aspects of the underlying proceedings, discussed further below, were not merely zealous

---

[11] The two congressional hearings addressed the "Fairness in Sentencing Act" and "Organized Crime on Wall Street." (2012.10.23 Request for Judicial Notice at 2) The "Organized Crime on Wall Street" hearings contained the March 2, 2000, press release from the EDNY U.S. Attorney's Office that revealed Sater's RICO conviction (Organized Crime on Wall Street, House Hearing, Sept. 13, 2000, at 195 & n.2, *available at* https://www.gpo.gov/fdsys/pkg/CHRG-106hhrg67115/pdf/CHRG-106hhrg67115.pdf.)

advocacy, but were "false and malicious." Pursuant to *Greene*, appellants are entitled to know and to have the opportunity to contest the evidentiary bases for this *ipse dixit* finding. The Committee failed to even charge the specific evidence demonstrating that appellants' statements were false or malicious, much less set forth the evidence demonstrating that such statements were false and malicious.

What is the basis for finding that each of these statements were false? What is the basis for finding that they were made with malice, which would require evidence of appellants' subjective state of mind, under *New York Times v. Sullivan,* 376 U.S. 254 (1964)? The Committee bore the burden to prove by clear and convincing evidence that each of the statements they rely on in imposing discipline was in fact false. Yet the Committee never identified "the evidence used to prove the Government's case," which "must be disclosed" to appellants, to give them the opportunity to contest, counter, and cross examine such evidence. Greene, at 496.

E.     **Due Process Required the Committee to Hold an Evidentiary Hearing.**

The Committee was required to hold an evidentiary hearing. The denial of an evidentiary hearing in this case worked a denial of due process, the opportunity to be fully heard, to present evidence and witnesses, to testify, and to confront and cross-examine accusers.

The *Peters* case, supra, is instructive. There, this Court held that it was a denial of due process for the district court grievance committee to fail to hold an

evidentiary hearing, even though the attorney had previously been sanctioned (and heard on the sanctions motion, which sanction was affirmed on appeal) regarding much of the same conduct. This Court held that even though a prior hearing had been held, the attorney had not been given sufficient opportunity to fully cross examine witnesses or to develop the evidence, and that the Committee could not "forego an independent evidentiary hearing" of its own. *Peters*, 642 F.3d at 385.

The *Peters* Court explained that even where an attorney is being disciplined for conduct as to which a prior proceeding and hearing have been allowed, "[A] district court grievance committee's decision not to hold a full evidentiary hearing did not violate the charged attorney's due process rights when (1) the risk of erroneous deprivation of the attorney's interest in practicing [law] before the district court was 'extremely low,' and (2) it "would largely duplicate a prior proceeding," and (3) where "the attorney had made no showing that such a hearing would reveal an infirmity of proof or lack of due process in the prior proceeding or risk of grave injustice from suspending [the attorney] on the basis of [a prior] order." *Id*.

Appellants did make an extensive showing that an evidentiary hearing was required, detailing that the claims in the Committee's OTSCs were seriously disputed, including as to their state of mind for charges requiring intent or knowledge. Yet the Committee found that it did not need to hold an evidentiary

hearing on the theory that "the facts in the record underlying the Committee's findings are not in dispute." (ECF 26, at 2). This was a dodge, and it is clearly false, because:

1. The facts relied on by the Committee in imposing discipline were and remain adamantly disputed.

2. When foregoing a hearing for factfinding, and relying on the lack of a genuine dispute of facts found in competing paper submissions, the Committee was required to view the evidence and resolve credibility and inferences in the light most favorable to appellants.

3. Appellants were denied their right and opportunity to cross-examine and confront their accusers.

4. Appellants were denied their due process rights to call and compel witnesses.

5. The Committee could not rely on issue preclusion as to statements made by judges in prior proceedings because of, among other reasons, the heightened burden of proof in a grievance proceeding (clear and convincing evidence) as opposed to the burden of proof before the other courts (preponderance of the evidence).

6. The Committee could not determine culpable state of mind as required for the discipline imposed based on the *disputed* paper record presented to them, questions of state of mind and specific intent being quintessential questions of fact.

**The Facts are Disputed**

Contrary to the Committee's assertion, the facts underlying its order were seriously in dispute, and thus an evidentiary hearing was and is required. The above statement of facts details the numerous disputes, but among the most material disputed facts are:

- That Sater's case and conviction were sealed by Judge Glasser, and whether such sealing satisfied constitutional requirements.

- That the documents from Sater's file "stated explicitly that they were sealed" and that Oberlander was aware that the documents were sealed.

- That "Oberlander continued to demand money from Sater and the other defendants" in *Kriss I* "and threatened to disseminate the sealed information" if they did not agree to a monetary settlement.

- That Sater's life and safety was and would be threatened by any revelation to his co-conspirators that he was a cooperating witness against them.

- That each of Oberlander's statements about the judiciary was "false and malicious."

The Committee also ***disregarded numerous material facts***, including, non-exhaustively:

- That Sater was *not* ordered to pay restitution to the victims of his racketeering, despite the MVRA and the CVRA. (ECF 19, at 8,Tarkington report, unsealed as redacted, at 91).

- That Judge Glasser repeatedly acknowledged there was no sealing order in Sater's case. (*Id.*, at 10-11, 14).

- That Oberlander attempted to file the SDNY complaint for Kriss *I* under seal, but his application was denied. (*Id.*, at 10).

- That the *Kriss I* SDNY action survived a 12(b)(6) motion and settled in Kriss's favor (and thus Oberlander's motives for filing it and sending demand letters could not be questioned).

- That Oberlander attached to his October demand letter a proposed *Kriss I* complaint that redacted material from the Sater documents at issue. (*Id.*, at 16, and ECF No. 13-22).

- That Oberlander's demand letter included a calculation of damages, showing that his clients had a good faith basis for asking for $35,000,000 in actual damages, and $105,000,000 after trebling under substantive law. (ECF 13-22).

- That the TRO prohibiting dissemination of Sater's non-PSR criminal documents expired on December 20, 2011. (Tarkington report, at 80).

- That Oberlander timely complied with Judge Cogan's April 1, 2011, order by destroying all of his copies, electronic and hard, of the documents at issue

by April 4, 2011, and certified as much to Judge Cogan. (*Id.*, 21-22; ECF 14-14).

- That via the Solicitor General, Judge Glasser, *ex parte*, sent two orders he issued to the Supreme Court unsealing portions of Sater's criminal case and explaining that the proffer agreement was not under seal and that the cooperation agreement did not need to be sealed had it even been filed with the court, which it was not, in addition to asserting that Sater was sentenced in open court. (*Id.*, at 39).

- That Archivist Mark confirmed that the Sater file, along with the files of his fellow cooperators Lauria and Klotsman, were sent to the National Archives unsealed and available to the public in 2004. (ECF 25-2; Mark letter).

- That, as testified to by Giannini, as counsel for Persico, Sater's co-conspirators contemporaneously knew that Sater was a cooperating witness, and were told as much by the government in 2000 (see ECF 24, and exhibits thereto).

- That the assertions made by Sater's attorneys regarding a threat against Sater from Persico because of Oberlander were false. (*See id.*)

- That the government conceded in its March 2011 motion that there was no evidence of risk of harm to Sater or his family by the disclosure of his conviction, and that the disclosure did not negatively affect their ability to obtain cooperators. (See Tarkington report, at 17-18).

- That the Government itself acknowledged that Oberlander "cannot be prevented from telling others about what he learned from the documents." (*Id.*, at 17).

- That the Sater docket (unsealed right before Oberlander wrote his motion seeking the recusal of Judge Glasser) revealed that Judge Glasser had held numerous *ex parte* meetings with the government and Sater's attorneys during the pendency of the proceedings involving Oberlander and discussed the issues raised by him through counsel Lerner. (*Id.*, 28).

- That the request for judicial notice was filed after Glasser closed the unsealing proceedings, and appellants wished to present evidence showing that Sater's conviction and cooperation were a matter of public record in various filings on the *Coppa* docket and in the Congressional Record.

- That Sater turned down witness protection and asserted that he did not need protection for his family according to a letter from AUSA Kaminsky, as of August 2012. (*Id.*, 32).

- That Vodicka had discovered for himself that "Doe" was Sater, and that he was the source for the *Miami Herald's* identification of Sater by name. (*Id., and see Vodicka Aff. at. ECF 15-14*).

As indicated by the foregoing, the Committee selected the facts that comported with a specific view of what happened while leaving out the evidence that supported a picture favorable to appellants. If the Committee had held an evidentiary hearing and then found facts and determined credibility based on that hearing, as the factfinder it could select which facts it wished to believe and which facts it decided not to credit.

Yet it is black letter law that when ruling on a paper record without holding an evidentiary hearing or a trial, such as in ruling on summary judgment or judgment as a matter of law, a court is required to view the evidence, and resolve inferences and credibility, in the light most favorable to the losing party, here Lerner and Oberlander. See, *e.g.*, *Tolan v. Cotton*, 572 U.S. 650, 656-657 (2014) ("[C]ourts may not resolve genuine disputes of fact in favor of the party seeking [to prevail on] summary judgment" but "must view the evidence in the light most favorable to the opposing party").

Here, the Committee stated that there were no disputes as to facts (and thus a hearing was unnecessary), but then selected facts that were the most favorable to the grievant, Sater, who neither testified nor submitted an affidavit in support of his

charges (nor did his attorneys). Instead, the Committee viewed so-called evidence in the light most favorable to Sater rather than appellants.

For example, appellants presented ample evidence that there was never a sealing order in Sater's case, as discussed at length above. Yet the Committee repeatedly asserts that Sater's case was sealed, citing in a footnote a contradictory statement from Judge Glasser in August 2012 that purports to retroactively presume into existence such an order. (ECF 26, at 4, n.3).

Further, Oberlander only threatened "lawful and legal" dissemination of information in his 2010 letters to Sater's counsel, explaining his expectation that "Judge Buchwald [will] order[] this public and your client finds this on the front pages everywhere." (ECF 13-24, at 1-2, Oberlander letter to Morgan Lewis) Indeed, he attached to the October letter a proposed redacted version of the *Kriss I* complaint, which did not contain any information from Sater's criminal documents. In the October letter, Oberlander had asserted that the SDNY RICO complaint would be made public—without containing any allegedly "sealed" information—and would bring notoriety because it still demonstrated hundreds of millions of dollars of money laundering and fraud by Bayrock in the development of major Trump properties. As the OTSCs failed to give notice that "extortion" would be charged, the October letter was not submitted below, but will be provided to this Court upon request).

The Committee repeatedly sided with Sater's unsworn version of the story that Oberlander threated to "publicly releas[e] documents that had been sealed by a federal court." (ECF 26, p.2). Ultimately, the Committee itself found that Oberlander "threatened to disseminate the Sealed Materials unless Sater and the other defendants in the Southern District action agreed to a monetary settlement." (ECF 26, p.38).

Because the Committee did not hold a hearing, the Committee was not at liberty to take Sater's unsworn view as credible and discard appellants' sworn evidence, including Oberlander's affidavit, the sworn expert reports of Professor Tarkington, and the Vodicka and Giannini affidavits. Without an evidentiary hearing, the Committee was required to resolve any disputed facts or inferences in Oberlander's favor, and in favor of Lerner, who was accused of having knowledge of Oberlander's emails before they were sent.

### F. Appellants Were Deprived of Their Right and Opportunity to Cross-Examine and Confront Their Accusers.

The Committee gave credence to Sater's unsworn allegations in his grievance charges, quoting them at the opening and closing of the 2018 orders. Yet appellants dispute Sater's allegation that they were threatening to disseminate sealed materials to extort a settlement. Because a hearing was not held, appellants were deprived of their due process right to confront their accusers and cross-examine witnesses, including Sater, on these very points.

The due process afforded in attorney disciplinary proceedings includes the right to confront witnesses. *Peters*, 642 F.3d at 385 (due process in attorney disciplinary proceedings includes "inter alia, adequate advance notice of the charges, and the opportunity to effectively respond to the charges and confront and cross-examine witnesses"). Had there been an evidentiary hearing, appellants could have subpoenaed and elicited the support of witnesses on their behalf, which they intended to do. They could have called as witnesses, for example, Giannini (to show no risk to Sater), Vodicka (to show that he was source of information to the Miami Herald), Paul Cassell (who testified before Congress that Sater's victims were denied Congressionally-mandated restitution because the Doe/Sater case proceeded, unconstitutionally and in violation of federal restitution law, in secret). Appellants could have called as witnesses both experts and attorneys with whom Oberlander consulted in drafting the *Kriss I* complaint—to show that it was not written as a tool of extortion, but was carefully drafted and reviewed by experts in the field, to assert and protect the legal rights of his clients, as well as other victims, including those of the derivative client, Bayrock.

Appellants had a constitutional right to call witnesses to testify on their behalf, a right founded in the Compulsory Process Clause of the Sixth Amendment, and which the Supreme Court has recognized "is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967); see

also *id*. ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense.")

At an evidentiary hearing, appellants also could have offered their own testimony, not only as to what factually occurred, but as to their intentions and state of mind. See *Rock v. Arkansas*, 483 U.S. 44 (1987) ("Logically included in the accused's right to call witnesses whose testimony is 'material and favorable to his defense,' is a right to testify himself, should he decide it is in his favor to do so." (internal citations omitted)). The Committee found that appellants acted "maliciously" without hearing from them, and without laying the elementary foundation for a finding of "malice"—that the statements made by appellants were (a) false, and (b) known to be false when made or with reckless disregard for the truth. *New York Times v. Sullivan*, 376 U.S. 254 (1964). The Committee's *ipse dixit* that their statements were false, without a showing of its basis for concluding that such statements were false, simply fails constitutional scrutiny.

The Committee repeatedly asserted that Oberlander had actual knowledge of the facts as to which there "was no dispute," including his knowledge regarding the alleged "sealing" of Sater's cooperation agreement and proffer (which proved to be false), that Bernstein obtained the documents wrongfully (which was never demonstrated by anyone), that Sater would be subject to harm from individuals and organizations he cooperated against (which was proved to be false), and even

asserted that Oberlander acknowledged exactly what he did not acknowledge, having testified that he did not "know" that the documents were sealed.

For example, the Committee states that at the June 21st hearing Oberlander "refused to admit that he knew they [the proffer and cooperation agreements] were sealed" and "refused to acknowledge that he knew" the circumstances under which Bernstein retained the Sater Criminal Documents. (ECF 26, at 8). The Committee thereby asserts that Oberlander misrepresented his actual knowledge while under oath.

The Committee cannot make such credibility determinations from a paper record. *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("Particularly where credibility and veracity are at issue...written submissions are a wholly unsatisfactory basis for decision.") Appellants vehemently dispute the Committee's findings and assertions as to their veracity, knowledge, intentions, and state of mind—and appellants had a constitutional right to testify in person on their own behalf and call witnesses in support of their testimony, to demonstrate both that the documents at issue were not sealed, that the statements that they made were founded in law and fact, and their state of mind in making any such statements.

**G.    The Committee Could Not Rely on Statements Made in Prior Proceedings as Preclusive Unless the Requirements for Issue Preclusion Were Satisfied, which They Were Not.**

The Committee repeatedly relied on statements, almost entirely dictum, adverse to appellants contained in various transcripts, court filings, and a few orders as conclusively decided for the grievance proceeding. For example, the Committee stated that "Judge Glasser also found that Bernstein had obtained the documents wrongfully, and that the respondent had documents which he knew or perhaps should have known may have been improperly obtained by Bernstein and passed onto him." (ECF 26, at 10-11). However, the Committee cannot rely on these statements in this proceeding as issue preclusive. That is because, first, the question of whether Bernstein obtained the documents wrongfully was never "actually litigated" before Judge Glasser (or anyone else), nor was it essential to any final judgment. This alleged "finding" is actually from Judge Glasser musing on the transcript about whether an order had been violated or not under various hypothetical circumstances. He opens the quote by saying "assuming that the documents were in John Doe's cabinet or in this desk, as they had a perfect right to be, they were his documents, and the documents were then wrongfully taken by Mr. Bernstein...." Note the opening word is "assuming"—Judge Glasser doesn't actually find that there was a wrongful taking at all, which issue was never actually litigated and decided in the prior proceedings. (ECF 13-17, at 19:11-20:10, Glasser

transcript of July 20, 2010). This was confirmed by Judge Glasser during his secret *ex parte* conference with the government, Sater's counsel and Sater himself, quoted above.

Second, even if Judge Glasser had actually found that Bernstein wrongfully took the documents, and even if that finding had been upheld on appeal, it could not be used as preclusive in this proceeding. "Issue preclusion does not apply when the party seeking to benefit from preclusion has a significantly heavier burden in the subsequent action than in the prior action." *Cobb v. Pozzi*, 363 F.3d 89 (2d Cir. 2004). Moreover, for there to be issue preclusion, there must be (1) a final judgment on the merits; (2) regarding the same issue; (3) that was actually litigated and decided; and (4) essential to the judgment. See, *e.g.*, *Wright and Miller, Federal Practice and Procedure* §4416.

Here, the Committee relied on statements made by Judges Glasser and Cogan, and to a lesser extent the Second Circuit's orders, where the burden of proof was preponderance of the evidence. In a disciplinary proceeding, the Committee must find facts by clear and convincing evidence, a significantly higher burden of proof.

Thus, for example, the Committee relies on Judge Glasser's "finding" in his March 23, 2011, "Scheduling Order" that Oberlander had "'knowingly and intentionally flouted a Court Order' by 'unilaterally deciding' to disclose

information in Sater's sealed criminal proceedings." (ECF 26, at 14). But, notably, the question of whether Oberlander knowingly and intentionally "flouted" the alleged sealing order was never actually litigated nor was it essential to any judgment, but mentioned randomly in a scheduling order. Moreover, the Second Circuit refused appellate review of the March 23, 2011, scheduling order, and issue preclusion is inappropriate against a party who lacked the ability to appeal the finding. See *Restatement (2d) of Judgments* §28(1) & cmt. a.

On top of those defects, even if the other elements of issue preclusion had been met, this finding was, at best, made by a preponderance of the evidence. Thus the Committee could not rely on Judge Glasser's "finding" because it is required to find any facts by clear and convincing evidence. As this Court explained in *Cobb*: "To apply issue preclusion [when the burden of proof is heavier in the second litigation] would be to hold, in effect that the losing party in the first action would also have lost had a significantly different burden [been] imposed....Since the process by which the issue was adjudicated cannot be reconstructed on the bases of a new and different burden, preclusive effect is properly denied'." *Cobb*, 363 F.3d at 114 (quoting *Restatement (2d) of Judgments* §28 (bracketed material in original)); see also *Cobb* at 114-15 (explaining that preclusion is improper where the initial finding was made by a preponderance and the subsequent action requires a finding by clear and convincing evidence).

Every statement or finding from prior proceedings that the Committee relied on or referred to was made in a proceeding governed by the preponderance standard, not the clear and convincing standard, as required here. Thus, the Committee could not properly—yet nonetheless did so—incorporate statements or findings made at the preponderance level, and clearly erred in treating prior statements of various judges as having collateral-estoppel effect.

In *Peters*, this Court found an evidentiary hearing was required in part because the Committee could not rely on the preclusive effect of a prior proceeding. *Peters*, 642 F.3d at 387 (due to an exception to issue preclusion, "the Committee was incorrect to rely on such preclusion doctrines as collateral estoppel and res judicata in finding that it need not hold its own hearing.")

### H. The Committee Could Not Determine Culpable State of Mind on the Disputed Paper Record Presented to Them.

At numerous points in the orders, the Committee made a determination of the mental states of appellants based solely on the paper record before them. These include findings that they acted knowingly, intentionally, and even maliciously. But questions of state of mind are questions for the factfinder, not resolveable on paper submissions. "It is important and ordinarily essential, that the trier of fact be afforded the opportunity to observe the demeanor, during direct and cross-examination, of a witness whose subjective motive is at issue." *Consolidated Elec. v. U.S. for Use*, 355 F.2d 437, 438-9 (10th Cir. 1966); see also *Schmidt v. McKay*,

555 F.2d 30, 37 (2d Cir. 1977) (where "an inquiry necessarily involves a dispute concerning state of mind and conflicting interpretations of perceived events, summary judgment is ordinarily not a proper vehicle for the resolution of such a dispute"); *Wright & Miller, Federal Practice & Procedure* §2730.

These principles hold for disciplinary proceedings. In *Peters*, this Court held that even though the attorney had previously been held to have violated a court order, a hearing was nonetheless required to show her state of mind as to that violation. The court explained that to impose substantial discipline for violating a court order, a finding of "venal intent" was required, along with a hearing to determine the attorney's "culpable state of mind," which the court explained, "would require detailed factual findings." See 642 F.3d at 394-96.

## I. Due Process Requires Notice of the Charges and an Opportunity to Be Heard.

### i. Appellants did not receive fair notice regarding the charge that they committed attempted larceny by extortion.

Due process for an attorney disciplinary proceeding requires "fair notice of the charge." *Ruffalo*, 390 U.S. at 550. The Committee found that appellants violated Model Rule 3.4(a)(6), by committing the crime of attempted larceny by extortion under NY Penal Law §§110.00 and 155.05(2)(e). Neither Lerner nor Oberlander has ever been charged with such crimes, nor were such crimes (or any crime, or criminal conduct, or citation to the NY Penal Law or any other penal

code) mentioned in the Disciplinary OTSCs as a potential basis for discipline. There wasn't even a charge in the Disciplinary OTSCs of any actual risk to Sater.

The statement of charges accuses appellants of "illegal conduct," by allegedly "contravening court orders" and "disclosing the Sealed Material" but it never charges misconduct on the basis of committing a crime, let alone the specific crime of attempted larceny by extortion under the NY Penal Law. In fact, the Disciplinary OTSCs do not contain the words "extort," "extortion," or "larceny."

What the Disicplinary OTSCs allege is that Oberlander "repeatedly threatened the public dissemination of the Sealed Materials unless Defendants agreed to a monetary settlement" (See ECF 2, at 3, Lerner OTSC), and then charge that appellants violated Rule 3.4 by "knowingly engaging in illegal conduct by contravening court orders, disclosing the Sealed Materials, and attempting to obtain a settlement by threatening further illegal conduct." (See ECF 2, Lerner OTSC, 6). There's no mention of any particular provision of the NY Penal Law.

Lerner's OTSC also charges him with violating Rule 1.16 by representing Oberlander "despite knowledge of Oberlander's intentions to obtain a settlement by threatening illegal conduct." The Committee denied Lerner's motion to reconsider the discipline, asserting that these phrases in the Disciplinary OTSCs provided "fair notice of the charge that he violated Rule 3.4 by committing attempted larceny by extortion." (ECF 34, p. 3, Reconsideration Denial). Yet the

phrase "threatening further illegal conduct" cannot be constitutionally sufficient notice that appellants were being charged with committing the specific crime of attempted larceny by extortion under the NY Penal Law.

Notably, on Page 5 of the OTSC, the Committee, in listing the bases for discipline, alleged as the first basis, that Lerner had "knowledge of Oberlander's intentions to obtain a settlement by threatening illegal conduct. See Point (C)1, supra." Point (C)1, in turn, alleges that appellants "threaten[ed] the public dissemination of the Sealed Materials unless the defendants agreed to a monetary settlement, despite knowledge that public dissemination of the Sealed Materials would violate multiple court orders." (ECF 2, at 3, Lerner OTSC). Thus, in the only place in the Disciplinary OTSCs where "threatening illegal conduct" appears, it is defined as threatening to "violate multiple court orders," not, as the Committee ultimately found, by committing larceny by extortion under NY Penal Law §155.05(2)(e) by demanding property through instilling fear by "accusing the victim [Sater] of a crime" or "exposing a secret that will harm the victim's reputation, career, and/or personal relationships, or otherwise subject the victim to hatred, contempt, or ridicule." (See ECF 26, at 37-88).

Indeed, the OTSCs do not contain any allegations whatsoever regarding any alleged threat of harm or humiliation of any kind to Sater. Instead, the only allegations in the OTSCs regarding the alleged threatened dissemination is that any

dissemination would allegedly violate court orders. Consequently, appellants

defended on the grounds that the demand letters were protected First Amendment

petitioning, under the *Noerr-Pennington* doctrine,[12] and that the letters did not

threaten to violate any existing court orders, but only threatened "legal and lawful

dissemination" as would be ordered by the courts. Appellants were entirely

unaware that they were being charged with and thus did not present any of the

legal or factual defenses (discussed below) to a charge of attempted larceny by

extortion.

Moreover, neither their expert, Margaret Tarkington, nor counsel for Lerner,

Rivkin Radler, understood that Lerner was being charged with attempted extortion

under the NY Penal Law or any other laws. Professor Tarkington prepared an

exhaustive analysis of each of the charges, concluding her report with a chart

analyzing each charge, but did not mention or analyze extortion, precisely because

no one understood appellants to be charged with it. (See DE 19 (sealed), and 91

(redacted), at 113-118)).

In its suspension orders, the district court twice quotes the unsworn

complaint against Oberlander as alleging that he "engaged in a relentless campaign

to extort a settlement...by publicly releasing documents that had been sealed by a

---

[12] *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

federal court." (ECF 26, at 2, 24). Yet the Committee did not itself bring such a charge for extortion in the actual Disciplinary OTSCs. Again, the Disciplinary OTSCs never charge misconduct on the basis of committing any crime and they do not even contain the words "extort," "extortion," or "larceny." The fact that the word "extort" was used in the unsworn 2014 complaints filed on behalf of the grievant that led to the Committee issuing the Disciplinary OTSCs in 2016 is immaterial and insufficient to satisfy due process: "No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." *Cole v. Arkansas*, 333 U.S. 196, 201 (1948); see also *DeJonge v. State of Oregon*, 299 U.S. 353, 362 (1937) ("Conviction upon a charge not made would be sheer denial of due process."); *Bousley v. U.S.*, 523 U.S. 614, 618 (1998) (explaining that "real notice of the true nature of the charge against him" is "the first and most universally recognized requirement of due process"); *16C CJS Constitutional Law* §1641 ("An intelligent and full understanding by the accused of the charge against him or her is a first requirement of due process. Thus, an indictment or information, to afford due process of law, must fairly inform the accused of the specific charge against him or her, and contain a statement of the acts which constitute the offense with reasonable certainty, so as

to advise the accused what he or she has to meet and give him or her a fair and reasonable opportunity to prepare his or her defense.")

As in *Cole*, appellants were not fairly informed of the specific charge of attempted larceny by extortion, and, consequently, they did not know to defend themselves against it. If appellants had had the slightest inkling that they were being charged with attempted larceny by extortion, they would have raised defenses thereto, and also have had their expert witness address such issues.

These core due process principles apply fully in the disciplinary context. In *Ruffalo*, the Supreme Court held that it was a denial of due process for an attorney to be disciplined where a charge was added after the attorney and another central witness had testified. Even though the disciplining state court asserted that "[t]he facts as to these [charges] are not in dispute" and allowed the attorney "several months to respond to" the new charge after the hearing, the Supreme Court still held it was a denial of due process to add the charge during the course of the proceeding, after he had submitted his own and others' testimony. See *Rufallo*, 390 U.S. 544, 549, 551 n.4. The Court explained:

> These are adversary proceedings of a quasi-criminal nature. The charge must be known before the proceedings commence. They become a trap when after they are underway, the charges are amended on the basis of testimony of the accused.

*Id*. at 551 (emphasis added).

The *Ruffalo* Court further explained that "no one knows" "[h]ow the charge would have been met had it been originally included in those leveled against the petitioner" by the Ohio disciplinary commission. Similarly here, because the charge was not in the OTSCs, appellants did not have any opportunity to answer the charge of attempted larceny by extortion and of allegedly threatening under NY Penal Law §155.05(e) to "accuse [Sater] of a crime" or to "expose a secret" that would harm Sater. (ECF 26, at 38). Thus, appellants were denied their fundamental due process right to "fair notice as to the reach of the grievance procedure and the precise nature of the charges." *Ruffalo*, 390 U.S. at 552; see also *Peters*, 642 F.3d at 387-90 (attorney denied due process right to notice where allegation was not raised until the third of five days of hearings and was not explicitly characterized as a charge).

ii. **Appellants Were Denied an Opportunity to be Heard as to both Legal and Factual Defenses to the Charge of Attempted Larceny by Extortion.**

Because appellants lacked notice of the charge of attempted larceny by extortion, they were completely denied their opportunity to be heard and to have a full and fair opportunity to litigate the issue. As with the entire proceedings, they were entitled on the attempted larceny charge to an evidentiary hearing—as the facts are disputed—and to call witnesses, testify on their own behalf, and confront

their accusers. They were deprived of the opportunity to raise any of the following defenses to the attempted larceny charge.

### iii. Oberlander did not threaten dissemination of "sealed" materials.

Based entirely on two settlement letters sent by Oberlander to the Morgan Lewis law firm in October and November 2010, the Committee found that Oberlander attempted larceny by extortion by "threatening to disseminate the Sealed Materials" unless Sater et alia agreed to a monetary settlement (ECF 26, at 38). The Committee defined the term "Sealed Materials" as Sater's cooperation agreement and financial statement, the two proffer agreements, and the PSR (ECF 26, at 5), none of which were actually sealed by any court order.

The two letters identified in the OTSCs were not the only communications between Oberlander and Herman during the pendency of the so-ordered standstill agreement relating to settlement. Had appellants known that they were being charged with attempted larceny by extortion, they would have submitted further correspondence showing that they were not threatening to disseminate allegedly "sealed" materials.

For example, attached to the October 18, 2010 letter was a copy of a proposed complaint that had redacted from it all material allegedly under seal, and explained that it was for purposes of dissemination to defendants in order to engage in settlement discussions, and that all information from Sater's PSR,

complaint, proffer, criminal information and cooperation agreement was marked

for redaction, in compliance with the parties' so-ordered standstill agreement

which allowed exactly that. (See ECF 13-22, at 2, Oberlander letter to Morgan

Lewis). Pparagraph 2.C of the standstill agreement stated that the parties "shall

promptly meet and confer in good faith concerning the redactions [to the *Kriss I*

Complaint]" and that the "redacted version...shall not include the Documents as

exhibits and shall not include references to, quotations of or information derived

from the Documents." (See ECF 13-20, so-ordered standstill agreement). Thus the

redacted Complaint also did not have attached as exhibits any of the allegedly

"sealed" materials.

Other correspondence with Morgan Lewis attorneys shows the discussion

that took place regarding preparing the redacted complaint. For example, in a letter

dated August 17, 2010 (to be provided to the Court upon request), Oberlander

explained why alleging Sater's cooperation was relevant to his client's claims, but

then offered "as an accommodation to get this thing resolved <u>I am willing in the</u>

<u>quiet period</u> **<u>to redact from the Complaint all allegations of cooperation but</u>**

**<u>leave in non-inflammatory allegations of the conviction</u>**." (Emphasis in

original). The letter also explains that Oberlander was aware of Sater's conviction

and his role as a cooperator, based solely on public documents, and had alleged

those facts in earlier drafts of the complaint pre-dating Bernstein even giving him

the documents at issue. The letter also notes that because *Kriss I* is a derivative

action, any settlement would be subject to court approval under FRCP 23.1.

Although the October 2010 letter predicts intense public interest in the

allegations of hundreds of millions of dollars of financial fraud in the development

of major Trump properties, as still alleged in the proposed redacted *Kriss I*

complaint, Oberlander was not threatening to publicly disseminate any allegedly

"sealed" materials. After all, Oberlander was in court when he heard Judge Glasser

himself say that there were no "sealing" orders. Moreover, Judge Glasser had

indicated in conference with the attorneys that he would be "unsealing" the

documents (and remember, Judge Glasser did ultimately find that the proffers and

cooperation agreement were never "sealed" and would be unsealed if they even

had been properly sealed).[13] Thus Oberlander states in the letter, "If you don't

stipulate I'll get it so ordered anyway because (as Judge Glasser himself pointed

out) the issue of dissemination is moot." It is in this context that Oberlander

predicts as much "lawful and legal worldwide dissemination...as the public and the

press doing the dissemination think its value justifies."

Oberlander was not threatening any illegal dissemination of sealed materials,

but instead predicting that SDNY complaint would ultimately be publicly

docketed, as the law requires (see *Lugosch*, supra, and *Hartford Courant v.*

---

[13] See Glasser Order of March 14, 2013 (DE 16-3, p.6).

*Pellegrino*, 380 F.3d 83, 96 (2d Cir. 2004), followed by dissemination by "the public and press," and thus "lawful and legal" dissemination because it would only be after such inevitable unsealing by the SDNY.

### iv. It is not larceny by extortion to threaten to accuse a person of a crime when the crime did occur and redress for the wrong is sought.

The Committee indicated that attempted larceny by extortion under the NY Penal Law had been committed because appellants were threatening either (or both) to "accus[e] the victim of a crime" or expose a harmful secret.

As to accusing a victim of a crime, there is a statutory affirmative defense found in Penal Law §155.15, that says that "it is an affirmative defense that the defendant reasonably believed the threatened charge [of crime] to be true and that his sole purpose was to compel or induce the victim to take reasonable action to make good the wrong which was the subject of such threatened charge."

Here, Oberlander not only had "reason to believe" (a) that Sater had committed the crime, he knew he had committed it and had been convicted of it, and had figured this out well before Bernstein gave him the documents, and (b) that, as Judge Schofield found (see ee *Kriss v. Bayrock Group*, 2016 US Dist LEXIS 167149 [SDNY Dec. 2, 2016]), his hiding of his EDNY RICO conviction from banks and investors (etc.) was itself a RICO predicate act. Moreover,

Oberlander was representing victims of Sater's crimes and was seeking to "compel or induce" Sater to "make good the wrong."

Although the Committee makes much of Oberlander's demands for the proposed settlement of "$35,000,0000," and "one billion dimes" (which is $100,000,000 dollars), the letters explain the legal and factual basis for these figures. (See ECF 13-22, at 1, Oberlander letter to Morgan Lewis). Oberlander was, through this letter, seeking redress for the actual damages caused to his clients (the $35,000,000 figure), along with their legal right to trebling ($105,000,000), pursuant to 18 U.S.C. §1964(c).

> **v.**   **Writing an intra-litigation settlement demand letter is not wrongful; it is protected petitioning, and cannot constitute extortion.**

The crime of larceny by extortion in New York requires an element of "wrongfulness." The New York Court of Appeals has explained "The essence of the crime [of extortion] is obtaining property by a wrongful use of fear, induced by a threat to do an unlawful injury." *People v. Dioguardi*, 8 N.Y.2d 260, 268 (1960) (emphasis added); *6 N.Y. Practice, Criminal Law* §12:9 (4th ed.). Thus, the New York Court of Appeals long ago observed:

> It is doubtless true that a demand for indemnity for a wrong, made in good faith, accompanied by a suggestion that legal proceedings will be resorted to unless satisfaction is voluntarily made is not a threat within the statute, although the wrong is one the disclosure of which would bring disgrace upon the guilty party.

*People v. Wightman*, 104 N.Y. 598 (1887) (emphasis added).

Here, Oberlander demanded indemnity for a wrong, and in good faith demanded the monetary damages to which his clients were entitled. The publicity that he indicated would arise from the lawsuit was a consequence of the filing of legal proceedings. That is not extortion. It is, instead, protected petitioning under the *Noerr-Pennington* doctrine. Oberlander only "threatened" that he would pursue his complaint, expressed his view that the court would unseal it, and that there would be worldwide publicity accordingly, as "the public and the press doing the dissemination think its value justifies."

"Threats of litigation, and even threats of meritless litigation, or the actual pursuit of such litigation, have been held not to constitute acts of extortion." *DirectTV v. Lewis*, 2005 WL 1006030, *4 (W.D.N.Y. 2005). Moreover, threats of "economically ruinous litigation, even unmeritorious litigation, do not constitute extortion." *Id.* at *5. Courts have recognized that "[e]xtortion is the antithesis of litigation as a means of resolving disputes. To promote social stability, we encourage resort to the courts rather than resort to force and violence." *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003).

Moreover, the First Amendment right to petition is implicated in punishing—whether through a criminal prosecution, a civil lawsuit, or a grievance proceeding—litigation and related activities, including demand and

settlement letters. In *DirectTV*, the district court explained that pre-litigation demand letters additionally did not constitute extortion because they "are protected by the *Noerr-Pennington* doctrine, a judicially created doctrine that protects a party's entitlement to act in furtherance of the First Amendment right to petition governmental authorities for redress." *DirectTV*, supra at *5.

The *Kriss I* suit against Sater was not meritless: It survived a 12(b)(6) motion to dismiss, and the Committee rejected the grievant's assertions that the litigation was frivolous. Consequently, the *Kriss I* case falls squarely within the protection of *Noerr-Pennington* doctrine. Certainly if "pre-litigation" demand letters constitute protected petitioning, intra-litigation settlement demand letters, like those authored by Oberlander, would be afforded equal if not greater protection by the Petition Clause, as litigation had in fact been commenced and petitioning of the judiciary had been invoked.

Oberlander filed a nonfrivolous derivative lawsuit, thus also invoking the district court's authority under Rule 23.1 to oversee and approve any settlement as fair, a fact he noted in his demand letters. His invocation of these processes belies any attempt or ability to pressure or obtain an extortionate settlement. He did not threaten to himself disseminate anything, but indicated that "Judge Buchwald" would "order it public," again relying on the judiciary and invoking its power to

make the material public. That is not extortion. That is not wrongful. That is petitioning court power, and is the antithesis of extortion. *Deck*, supra.

Moreover, the fact that an attorney explains in a demand letter that publicity, even embarrassing or detrimental publicity, may follow the filing of litigation does not undermine the Petition Clause's protection of the demand letter or render it extortionate. This Court in *Sussman* and in *Revson* held that "warnings by a party of its intention to assert non-frivlous claims, with predictions of those claims' likely public reception are not improper." *Revson v. Cinque & Cinque*, 221 F.3d 71 (CA2 2000). In *Sussman v. Bank of Israel*, 56 F.3d 450 (1995), attorney Lewin sent pre-litigation demand letters to Israeli government officials, "including then-Prime Minister Yitzchak Shamir, then-Minister of Finance Yitzchak Moda'I, and Bank of Israel Governor Michael Bruno," warning them that "[i]f this controversy erupts into public view with the filing of our lawsuit...[it] will seriously damage foreign investment in Israel in the future." The letter continued:

> Our clients have heretofore been reluctant to take the step of filing suit because a full airing of this outrageous conduct by the Government of Israel will surely deter many potential foreign investors who might otherwise be interested in lending financial resources to Israel.

*Id*. at 453.

The district court issued sanctions for the demand letters as they were "designed to force the withdrawal of the Israeli action by threatening the Israeli government with negative publicity that would result in 'economic damage to

Israel'." *Id*. at 455. This Court reversed, finding that for a non-frivolous complaint, it was not an improper purpose "to exert[] pressure on defendants through the generation of adverse and economically disadvantageous publicity." *Id*. at 459. The court explained: "Mere warnings by a party of its intention to assert nonfrivolous claims with predictions of those claims' likely public reception are not improper." *Id*. (emphasis added). Likewise, it was "not improper" for Oberlander, like the *Sussman* lawyer, to make "predictions of those claims' likely public reception." See *id*. at 459.

**vi.**    **Oberlander's clients had a good faith legal claim to damages of $35,000,000, plus potential trebling, and thus the demands were not wrongful or extortionate.**

This Court upheld the following jury instruction as to wrongfulness in an extortion trial under the *Hobbs* Act (which is modeled on the NY Penal Law):

> "Wrongful" means that in order for you to find that any of the acts of extortion alleged in these counts were, in fact, committed, you must find beyond a reasonable doubt that the defendant or defendants you are considering **had no lawful right to the property obtained**, and that the property was obtained because of the victim's fear of economic loss.

*U.S. v. Clemente*, 640 F.2d 1069, 1077 (1981) (emphasis added).

More recently, in *United States v. Jackson*, 180 F.3d 55, 70 (2d Cir. 1999), this Court explained that "a threat to cause economic loss **is not inherently wrongful**; it becomes wrongful **only when it is used to obtain property to which the threatener is not entitled**." (Emphasis added). Again, Oberlander's October

2010 letter discloses his clients' lawful rights and entitlement to the property that he demanded. Moreover, as Oberlander asserted in his communications with Morgan Lewis, *Kriss I* is a derivative action, and thus any settlement would have to have been approved by the district court as fair. The purpose of the "court approval [being] to insure that the settlement is fair to all and does not favor the named plaintiff-shareholders or their counsel." *Blatt v. Dean Witter Reynolds*, 732 F.2d 304, 307 n.1 (2d Cir. 1984). Oberlander could not have been attempting or committing extortion by calculating out the damages and reminding opposing counsel that any settlement must be approved by the court as fair.

### vii. Threatening to Reveal the "Secret" of Sater's Conviction Was Not Extortion by Larceny.

The Committee additionally relied on the definition of larceny by extortion under the theory that Oberlander sought a monetary settlement by threatening to "expos[e] a secret that will harm the victim's reputation, career, and/or personal relationships, or otherwise subject the victim to hatred, contempt or ridicule." (ECF 26, at 38). (Lerner, however, as counsel for Oberlander only in the EDNY proceedings, could did not have any pecuniary interest in the outcome of the *Kriss I* action; at least there was no allegation, much less proof, that Lerner had a pecuniary interest in *Kriss I*).

In a case similar to this one, an attorney wrote a prelitigation demand letter in which he provided a draft complaint alleging that the defendants had embezzled

money from clubs and restaurants they owned, and used some of that money to "arrange sexual liaisons with older men," including a judge. The draft complaint left blank spaces for the names of the sexual partners, and stated that if settlement wasn't achieved within five days, the attorney would file the complaint and the blanks would be filled in (and thus publicized). The California appellate court held that the demand letter could not be extortionate because "the 'secret' that would allegedly expose [the defendant] and others to disgrace was **inextricably tied to [the] pending complaint**" as "[t]he demand letter accused Malin of embezzling money and simply informed him that [the plaintiff] knew how he had spent those funds." See *Malin v. Singer*, 217 Cal.App.4th 1283 (2013) (emphasis added).

Here, the hiding of Sater's conviction was inextricably tied to the RICO claims made in the *Kriss I* complaint. Sater's conviction had a nexus to the *Kriss I* plaintiffs' claims to compensation from him, which were based in part on being defrauded by the concealment of that conviction. ***And this allegation was upheld by Judge Schofield as proper***, denying the defendants' motions to dismiss the claim in the *Kriss I* action. See *Kriss v. Bayrock Group LLC*, 2016 US Dist LEXIS 167149 [SDNY Dec. 2, 2016]). Thus even if there were a threat to reveal his conviction in the complaint, it would not be extortionate.

The Committee, in denying Lerner's motion to reconsider, cited to *Dawkins v. Williams*, 511 F.Supp.2d 248, 258-60 (NDNY 2007), stating that Oberlander's

"threats contained in the letter were 'wholly gratuitous' and would not 'materially benefit' Oberlander, but were 'simply...a tool to obtain money' from Sater." (ECF 34, at 3, n.2, quoting Dawkins). But *Dawkins* merely restated that to be wrongful the threat to reputation must have "no nexus to a claim of right." See *Dawkins*, 511 F.Supp.2d at 258-59. Indeed, the entire quote from *Dawkins* is that "the type of threat proscribed by [extortion laws] are wholly gratuitous ones, in that the threatened disclosure would not in and of itself materially benefit the actor (for example by being a part of the pursuit of some legal remedy), but simply is a tool to obtain money from the victim." *Id*. (emphasis added). The hiding of Sater's conviction was a central aspect of his RICO fraud, as alleged in the SDNY action, and as upheld by Judge Schofield. Therefore, the demand letters could not have been extortionate.

### viii.   Sater's conviction and cooperation was no "secret."

As a factual matter, Sater's conviction and cooperation (although hidden for years from business partners like Jody Kriss and from Bayrock investors and lenders) was no secret. There is myriad evidence that Sater's conviction was public, as demonstrated at length above. Moreover, the Committee asserted that public dissemination "would expose Sater to retaliation from individuals and organizations about whom he was providing information ECF 34, as well as to public humiliation," and that Lerner and Oberlander "knew" as much. (ECF 26, at

40). The Committee has the burden to prove disciplinary charges by clear and convincing evidence. No evidence was included in the orders that Sater was actually threatened or exposed to retaliation from specific individuals or organizations once his conviction became public, which actually happened in 2000.

### ix. Neither Oberlander nor Lerner had the specific intent to attempt larceny by extortion and Lerner engaged in no act in furtherance thereof.

The Committee found that appellants committed attempted larceny by extortion, citing NY Penal Law §110.00 for the crime of attempt. Attempt is a specific intent crime. Thus, as the New York Court of Appeals has explained:

> [I]t must first be established that the defendant acted with a specific intent; that is, that he intended to commit a specific crime. It is not enough to show that the defendant intended to do some unspecified criminal act. Secondly it must be proven that the defendant acted to carry out his intent.

*People v. Bracey*, 41 N.Y.2d 296, 300 (1977).

The Committee cited absolutely no evidence that appellants had the specific intent to commit the crime of larceny by extortion. The finding as to Oberlander's intent is based on the fact that "he is an experienced lawyer with multiple degrees" and thus allegedly "knew" that "public dissemination of obviously sensitive documents...would expose Sater to retaliation from individuals and organizations about whom he was providing information ECF 26, as well as to public humiliation." But the Committee presented no evidence that Oberlander knew any

of this. It appears that the Committee believed that because Oberlander was doing a dual PhD in mathematics and economics at Yale when he was nineteen years old (while simultaneously teaching grad students and picking up a law degree for fun from Quinnipiac Law School in three semesters), Oberlander was subject to a different standard, as though the higher his IQ the lower the Committee's burden of proof.

Moreover, even if he did know that, it would be insufficient for the specific intent to commit larceny by extortion, which requires the element of a wrongful threat (as discussed above). Thus Oberlander would have to have specifically intended to obtain property from Sater by "a wrongful use of fear"— by using threats (unrelated to his client's claims for relief) to obtain money as to which his clients had no basis for claiming a legal entitlement. Without such proof, any punishment, whether criminal or civil liability, or grievance sanctions, would violate (as do the disciplinary orders herein) the *Noerr-Pennington* doctrine.

Finally, on top of the above, the Committee could not, on paper submissions, make the requisite determination of appellants' mens rea. Specific intent is a quintessential question of fact. As to Lerner, the Committee found that because Lerner conceded he "was aware" of the letters (at the time of the letters, Lerner did not represent anyone in the *Kriss I* action, only Oberlander did), his intent was "inferable" because he "does not claim ignorance of Oberlander's threatening

letters, or say he did not assist Oberlander in sending the letters, in his submission." (ECF 26, at 40).

The Committee had the burden to prove by clear and convincing evidence that Lerner had both the affirmative mens rea—the specific criminal intent to commit larceny by extortion—and performed an actus reus; absent such, there can be no "attempt." Yet its only evidence is Lerner's passive awareness of the letters and that he failed to claim ignorance of and failed to say that he did not assist with the letters in his written submission to the Committee. (Again, notably, Lerner's submission to the Committee was made when Lerner had no idea that he would be charged with attempted larceny by extortion.) The utter absence of evidence regarding Lerner's actual state of mind (mens rea) and his actions in furtherance (actus reus) means that the Committee failed to meet its burden of proof on this charge; the lack of proof cannot be used to infer that Lerner must have had the requisite mens rea. .

Merely being aware of another person's actions is not specific intent to commit a crime. To be guilty of attempt, a person must not only have the specific intent to commit the crime, but also must take an affirmative act in furtherance of the crime (the actus reus) because "the law does not punish evil thoughts." *Bracey*, 41 N.Y.2d at 300. The Committee cites no evidence that Lerner performed any affirmative act related to the alleged attempted extortion. He was merely aware of

the letters, as were attorneys David Schulz and Paul Cassell. To punish Lerner for awareness without an affirmative act on his part contravenes *Bracey*. *Id*.

Additionally, the Supreme Court has held that for extortion made by verbal threats (which raises First Amendment problems), "what [the threatener] thinks does matter." Thus there must be an "evil intent actually existing in his mind." Elonis v. U.S., 575 U.S. 723, 738 (2015) (internal citations omitted; emphasis added). That a reasonable person would think something is a threat is insufficient to show a culpable state of mind. See *id*. That is, the test is subjective.

Finally, because Oberlander did not commit attempted larceny by extortion for the forgoing reasons, Lerner also cannot be disciplined under Rule 1.16(b) for failing to withdraw "when he [allegedly] learned that Oberlander was "extorting" a settlement from the Southern District defendants." (ECF 26, at 31).

As the charges of attempted extortion that were not included in the OTSCs, but appeared for the first time in the orders imposing discipline, those charges must be dismissed, which itself requires reversal and vacatur of the disciplinary orders appealed from.

**Point II:**    **The Court Erred in Rejecting the Constitutional Standards for Punishing Speech Regarding the Judiciary, and Instead Applied Obsolete, and Unconstitutional, Standards from *Holtzman* and *Bevans*.**

### A.    Introduction

In concluding that appellants violated Rule 3.3(f)(2)'s prohibition on "undignified or discourteous conduct," the Committee erred in disregarding their arguments regarding the applicable First Amendment standards for punishment of speech critical of the judiciary, and erred in relying on the abrogated decisions, *In re Holtzman*, 78 N.Y.2d 184 (1991), and *In re Bevans*, 233 N.Y.S. 439 (3d Dep't 1929).

The Committee correctly stated that *Holtzman* rejected application of *New York Times v. Sullivan*'s "actual malice" standard to attorney discipline. (ECF 26, at 35). Instead, *Holtzman* applied "an objective standard of what a reasonable attorney would do in similar circumstances." 78 N.Y.2d at 193. Citing *Bevans*, the Committee ultimately held that appellants' statements were sanctionable as "an offence against the dignity and integrity of the courts and our judicial system." (ECF 26, at 35, 37).

*Bevans* was decided in 1929, only four years after the First Amendment had been incorporated as applicable against the states in *Gitlow v. New York*, 268 U.S. 652 (1925). The Supreme Court did not clarify until the 1950s and 1960s that the First Amendment even applied to attorney discipline, see, *e.g.*, *NAACP v. Button*,

371 U.S. 415 (1963), and First Amendment jurisprudence would not address criticism of government officials for nearly forty years, with the advent of *New York Times v. Sullivan*, 376 U.S. 254 (1964), and *Garrison v. Louisiana*, 379 U.S. 64 (1964).

In *New York Times v. Sullivan*, the Supreme Court held that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood...unless he proves that ***the statement was made with 'actual malice'***—that is, ***with knowledge that it was false or with reckless disregard of whether it was false or not.***" 376 U.S. at 279-80 (emphasis added). Shortly thereafter, in *Garrison*, the Supreme Court overturned the conviction of a district attorney for criminal defamation after the DA held a press conference and attributed "a large backlog of pending criminal cases to the inefficiency, laziness, and excessive vacations" of particular judges and mused about possible "racketeer influences on our eight vacation-minded judges." 379 U.S. at 66 (emphasis added). It was in this context, where an attorney had accused judges of being under "racketeer influence," that the Supreme Court emphasized the importance in a self-governing nation of free criticism of the judiciary.

Thus, the Court held that "only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times v. Sullivan* may be the subject of either civil or criminal sanctions." *Id*. at 74

(emphasis added). The *Sullivan* standard (also known as the "actual malice" standard) requires an examination of the speaker's subjective intent, and the speaker must have "in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

Further, under Garrison and Sullivan, the entity imposing sanctions for speech regarding a public official (here the Committee) must prove the falsity of the speech. This is so because, constitutionally, "[t]ruth may not be the subject of either civil or criminal sanctions," *Garrison*, 379 U.S. 64, 74 (1964) (emphasis added).

Despite *Garrison* and *Sullivan*, and the ABA's incorporation of the *Sullivan* standard into Model Rule 8.2, many courts interpreted Rule 8.2 to create a different standard. In *In re Holtzman*, 577 N.E.2d 30, 34 (N.Y. 1991), the New York Court of Appeals followed this trend, rejecting *Sullivan*'s subjective "actual malice" standard and instead adopting "an objective standard of what a reasonable attorney would do in similar circumstances."

Nevertheless, other courts, most notably the Ninth Circuit in the very influential case, *Standing Comm. on Discipline v. Yagman*, 55 F.3d 1430, 1437, 1440 (9th Cir. 1995), protected attorney speech regarding the judiciary, even in spite of employing an "objective standard." In *Yagman*, the Ninth Circuit employed a reasonable attorney standard (rather than a subjective actual malice

standard), yet explained that "[a]ttorneys who make statements impugning the integrity of a judge are, however, entitled to other First Amendment protections," specifically (1) attorneys could only be sanctioned for statements regarding the judiciary "if their statements are false; truth is an absolute defense;" (2) "the disciplinary body bears the burden of proving falsity"; (3) the statements must be "capable of being proved true or false: statements of opinion are protected by the First Amendment unless they 'imply a false assertion of fact'," and "statements of 'rhetorical hyperbole aren't sanctionable, nor are statements that use language in a loose, figurative sense." See *id*. at 1438.

Critically, the Committee erred in treating *Holtzman* as the controlling law. Subsequent to the *Holtzman* decision, the New York courts, through adoption of the New York Rules of Professional Conduct (NYRPC) in 2009, and specifically through the adoption of NYRPC 8.2, abrogated *Holtzman*'s "reasonable attorney" test. Upon New York's adoption of the NYRPC, the reference to conduct "degrading to a tribunal" in Rule 3.3 was removed.

Instead, the provision in the NYRPC that specifically addresses attorney statements regarding the judiciary is Rule 8.2(a), which as of 2009 provides: "A lawyer shall not knowingly make a false statement of fact concerning the qualifications, conduct or integrity of a judge" (emphasis added). Rule 1.0(k) defines "knowingly" as "actual knowledge of the fact in question." That is, quite

clearly, a subjective, rather than an objective, assessment, as required by Garrison and Sullivan. That is, *Holtzman* is dead law, and the Committee was required to prove both falsity, and appellants' subjective knowledge that their statements were false.

It is explicit in NYRPC 8.2 that the Committee has the burden to prove, by clear and convincing evidence, that each statement was, in fact, false. Additionally, an attorney can only be disciplined for making "a false statement of fact," and thus cannot be punished for statements of opinion, or even rhetorical hyperbole.

These standards are not merely a technical change to the NYRPC, but align New York law and regulation of attorneys with the U.S. Constitution's standards for punishing speech critical of the judiciary, outlined above. Moreover, in *Legal Services Corporation v. Velazquez*, 531 U.S. 533, 545 (2001), the Supreme Court recognized a free speech right belonging to attorneys to express and raise arguments in court proceedings and filings. Although *Velazquez* dealt with Congressional restrictions on attorneys, analogously, courts are prohibited by the First Amendment from "impos[ing] rules...which in effect insulate [judicial actions] from legitimate judicial challenge" and "exclude from litigation those arguments and theories [that the judiciary] finds unacceptable but which by their nature are within the province of the courts to consider." *Id*. at 545.

Professional discipline for impugning judicial integrity can foreclose and certainly chill "analysis of certain legal issues," encouraging attorneys to "truncate [their] presentation to the courts" when raising arguments regarding judicial error, incompetence, or malfeasance, thereby denying attorneys and their clients their constitutionally protected "speech and expression." *Id*. at 545, 547-48.

Although the charges brought against appellants were not brought under Rule 8.2, but under NYRPC 3.3 (and also other catch-all provisions, including engaging in conduct that adversely reflects on fitness as a lawyer or conduct prejudicial to the administration of justice), it is crucial to recognize that constitutional constraints that have been specifically incorporated into NYRPC 8.2 cannot be avoided merely by charging discipline under a different rule. Because the First Amendment jealously protects speech regarding public officials, including the judiciary, the restrictions apply regardless of the specific rule employed by the Committee, whether it be called "discourteous conduct" or "statements regarding the qualifications, conduct, or integrity of a judge," or "conduct prejudicial to the administration of justice."

For example, in *Button*, Virginia argued that it was not prohibiting speech, association, or petitioning, but instead was just prohibiting "solicitation," to which the Supreme Court responded: "[A] state cannot foreclose the exercise of constitutional rights by mere labels." *Button*, 371 U.S. at 429. Labeling discipline

under 3.3 rather than 8.2 cannot avoid the constitutional requirements attendant to punishing speech regarding public officials, which are now incorporated into NYRPC 8.2.

**B.      Had the Committee applied the correct standards, it could not have imposed discipline for appellants' speech regarding the judiciary.**

Had the Committee applied the correct standard, it could not have imposed discipline because (1) there was no evidence as to the subjective intent or knowledge of either appellant and thus the Committee clearly erred in finding that the statements were "malicious"; (2) the Committee did not prove that the statements were false; (3) they had a reasonable basis for their statements of fact (and were entitled to a hearing to establish as much) and they cannot be punished for statements of opinion or rhetorical hyperbole; and (4) attorneys must be protected in disclosing and objecting to even perceived judicial deviations from constitutional, statutory, and ethical requirements, because lawyers are the class of persons with greatest exposure to and knowledge of the judiciary to check the use of judicial power. This is particularly so when it comes to lawyers objecting to the holding of closed or *ex parte* proceedings, as open courts are the primary democratic check on the judicial power.

### i. The Committee could not, from a paper record, determine that appellants' statements were "malicious."

As argued above, the Committee was required to hold a hearing and could not make findings regarding appellants' states of mind from a paper record. Without a hearing, the Committee was required to view the evidence in the light most favorable to the parties opposing the motion, here Lerner and Oberlander. Both asserted through their submissions that they had a reasonable basis for their statements, and presented supporting evidence. The Committee could not, without a hearing, "find" that appellants acted with malicious intent.

### ii. The Committee cannot discipline appellants for statements not contained in the disciplinary charges.

The Committee listed statements by one or both Lerner and Oberlander which formed the basis for imposing discipline. However, many of the statements were not included in the Disciplinary OTSCs and thus appellants never had any opportunity to respond to or address those statements, even by paper submission, thus working a denial of due process as discussed in the *Ruffalo* and *Peters* cases above. The third, fourth and fifth bulleted statements quoted in the August 13, 2018 order as to Oberlander, on page 20, as well as all of pages 21 and 22 and footnote 14 on page 24 were not included in the Disciplinary OTSCs for either Lerner or Oberlander. Therefore discipline may not be predicated upon them.

### iii. The Committee Bore the Burden to Prove Each of the Charged Statements False.

Because a true statement cannot, constitutionally, be the basis for either civil or criminal sanctions, it thus cannot be the basis of quasi-criminal attorney discipline, see *Yagman*, *Sullivan*, and *Garrison*, supra, so the Committee bore the burden of proving by clear and convincing evidence that any statements for which appellants might be disciplined were in fact false. The Committee merely recites the statements and summarily finds, *ipse dixit* without any analysis or showing of evidentiary support, that all of the statements are "false and malicious."

To the extent that the Committee has evidence proving that the statements are false, appellants have a due process right under *Greene* to know "the evidence used to prove the Government's case" and to have the opportunity to counter or contest it. *Greene*, at 496. As to the statements that were actually charged (as opposed to those additional statements that were not included in the OTSCs), appellants demonstrated that they had a reasonable basis in fact and law for making them. As to the statements that were not charged—like the post-OTSC charges of attempted extortion—the claims that they were violative of the Disciplinary Rules that appeared for the first time in the orders imposing discipline must simply be vacated, which itself requires reversal and vacatur of the disciplinary orders appealed from.

**C.    The Appellants Had a Reasonable Basis in Fact for the Charged Statements and at the Very Least Were Entitled to a Hearing to Demonstrate the Bases for their Statements.**

The statements charged as "unfounded accusations" and found by the Committee to be "false and malicious" can be categorized into a few basic criticisms, which appellants argued had a reasonable basis in fact and as to which they were entitled to a hearing to demonstrate the bases for these criticisms. The basic categories of their primary complaints can be summarized thus:

The basic categories of their primary complaints can be summarized thus:

(1) ***Statements objecting to—as illegal and unconstitutional—the secrecy of court proceedings, including the "blanket sealing" of Sater's case and other criminal cases from the public view***, the lack of a producible or docketed sealing order, the ***failure to maintain a public and accurate docket*** for certain criminal matters, and accusations that the court has thereby "concoct[ed] a system of private justice without public accountability," and "hid[den] an entire covert justice system operating devoid of constitutional legitimacy," which appellants characterized as "seditious," "illegal," "unconstitutional," or "a star chamber."

Even though the Committee had the burden to prove falsity, these statements are not "false" or even "unfounded" as alleged in the Disciplinary OTSCs. Rather, the record shows them to have a reasonable basis in fact and thus they cannot be

punished, as such would violate appellants' First Amendment rights. As discussed above, there is ample evidence that Sater's criminal case was hidden, without a lawful sealing order, and that the courts attempted to shut down revelation of his unlawfully hidden docket. This Court has made clear that sealing a case without notice or an order or findings is "illegal." See *U.S. v. Alcantara*, 396 F.3d 189, 191-92 (2d Cir. 2005); *Hartford Courant v. Pellegrino*, 380 F.3d 83, 96 (2d Cir. 2004).

As to labeling this "seditious," appellants did not use the term "seditious" without context, but specifically defined it to mean "maladministration in official office," as **Blackstone defined it**. (See ECF 15-5, p.17, setting forth the common-law history of the word, along with how our Framers understood it). Further, appellants articulated precisely the alleged maladministration at issue: "Federal judges cannot operate in secret or in combination with probation officers and officials of the Department of Justice, to evade mandatory restitution laws or any other mandatory sentencing laws. It's seditious." (ECF 15-5, at 17).

Appellants submitted evidence substantiating that "inaccurate" and non-public dockets were kept.[14] The docket under which Oberlander was brought into

---

[14] Oberlander also argued that in Cogan maintained an "inaccurate docket" in case number 10-CR-00173, involving cooperator Sebastiano Saracino, where "a motion to close a courtroom was made and discussed in public proceedings on December 2, 2010," but was "never docketed upon your honor's ejection from the courtroom of reporters." The Committee quotes the "inaccurate" docket comment as one that

the EDNY with Glasser's OTSC was entirely hidden and not available to the public throughout the proceedings against Oberlander. Moreover, the docket was not contemporaneously maintained, but itself demonstrates that items were belatedly entered, years after being filed. Cogan then initially proceeded under that same hidden docket that was originally Sater's criminal case, 98-Cr-1101.

Appellants protested against Cogan hearing and docketing a contempt proceeding being brought against them on Sater's criminal docket, which is the context for the statement that Cogan should not be able to proceed against them on Glasser's "long dead and illegally empty docket," referring to Sater's criminal docket 98-Cr-1101, which was then still invisible to the public and to Lerner and Oberlander. Appellants argued that to proceed against them for alleged contempt on the nonpublic docket of Sater's closed criminal case is "simply unsustainable as anything other than participation in the conspiracy of secret courts." The Committee quotes this statement (without the context) specifically in finding that the statements were "false and malicious attacks" (ECF 26, at 34-35, 36). Yet Cogan did in fact proceed against appellants on a contempt OTSC on the nonpublic

---

they specifically find to be "false and malicious" (Oberlander Or. at 34), but the Committee does not cite to any evidence disputing or proving false Oberlander's contentions regarding the Saracino case. Subsequently, Lerner published an article about many other such secret dockets within the Second Circuit, entitled "Secret Prosecutions and the Erosion of Justice," available at https://www.law360.com /articles/688835/secret-prosecutions-and-the-erosion-of-justice.

docket of Sater's long-since closed criminal case (98-Cr-1101). Eventually, however, and only after media involvement, did Judge Cogan open a separate docket, 12-MC-557.

The Committee also says that referring to proceedings as "a star chamber" is not a "harmless historical reference." (See Oberlander Order, p. 33). However, the phrase was used because a major legacy of the historical Star Chamber was operating in secret, which is a grave affront to our traditions of openness. That was the point of the historical reference, one employed by the U.S. Supreme Court in emphasizing the dangers of courts operating in secret, which is exactly what appellants were objecting to by employing that same reference. See, *e.g.*, *In re Oliver*, 333 U.S. 257, 268-69 & n.22 (1948) ("[T]he traditional Anglo-American distrust for secret trials has been variously ascribed to the notorious use of this practice by . . . the English Court of Star Chamber").

The U.S. Supreme Court has given an imprimatur of propriety to calling secret proceedings "star chambers," and an attorney cannot (without violating the First Amendment) be sanctioned or otherwise disciplined for using the same historical reference that the U.S. Supreme Court has approved.

(2) **Statements that the courts failed to comply with Congressional mandatory sentencing laws**, such as the MVRA and the CVRA ECF 19, resulting in victims not receiving restitution as mandated by statute,

"cover[ing] up...illegal sentencing schemes," and calling such "unlawful," "illegal," "lawless" "unethical," "judicial misconduct," and "sedition"

Again, even though the Committee has the burden to prove falsity, these statements are not "false" or even "unfounded" as charged, but instead the record shows them to have a reasonable basis in fact. The fact of the matter is that cooperators like Sater and Lauria were not required to pay restitution to their victims, who were cheated by them of about $40 million dollars, that such was—at least in appellants' good-faith opinion—in contravention of mandatory sentencing laws, that those "illegal sentences" were then "covered up" by being "super sealed" and not docketed publicly, even though Sater's sentencing was held in open court according to Judge Glasser's submission to the US Supreme Court in March 2013.

(3) **Statements objecting to the prior restraint orders prohibiting Oberlander from telling anyone, even Congress** about Sater's conviction or the terms of his sentence without mandatory restitution, and statements that it was "illegal" and "unlawful" to issue the order to show cause to enforce such a prior restraint on Oberlander for allegedly revealing his own name to the New York Times.

Again, even though the Committee has the burden to prove falsity, these statements are not "false" or even "unfounded" as charged, but instead the record shows them to have a reasonable basis in fact. Given that prior restraints are

"presumptively invalid" and are the "least tolerable" restraint on speech, it cannot be "false" to argue that creating or enforcing one is "illegal" or "unlawful." Appellants were temporarily enjoined from telling anyone, including, specifically, Congress, about the Sater case, including the failure to award restitution to Sater's victims in violation of the CVRA and MVRA. (See ECF 14-2, at 2, ¶ 4, Second Circuit temporary injunction order of February 10, 2011).

(4)  **Statements that Judge Glasser was required to recuse himself** because of the judge's "appearance of bias and lack of impartiality, [is] palpably obvious to, let alone reasonably questioned by, an objective, informed observer" and that "the observer cannot rationally conclude but that your honor appears to be in criminal conspiracy with at least Sater's lawyers, to deprive us and our clients of our rights."

Albeit zealous, these statements in the context that led to them were not "unfounded" as charged or false, but instead the record shows them to have a reasonable basis in fact. Moreover, the Committee had the burden to prove them false. The context in which this was stated is (1) the Sater criminal docket 98cr1101 had just been unsealed and showed repeated *ex parte* communications between Judge Glasser and the government and Sater's lawyers, one or more of which were initiated by Judge Glasser himself; (2) Judge Glasser had closed the courtroom, excluding appellants and the press, from participating or making

arguments in the hearing regarding unsealing of docket entries; (3) when appellants attempted to introduce evidence for the court to consider about the lack of risk to Sater via request for judicial notice, which avenue they used precisely because they had been excluded from the hearing, Judge Glasser responded by threatening them with sanctions; (4) Sater's counsel Nader Mobargha's May 18, 2011 email, which was sent shortly after the secret *ex parte* conference with Judge Glasser on April 27, 2011, threatened Oberlander that Judge Glasser would not listen to any arguments or heed any evidence presented by him (ECF 14-22); (5) that hiding Sater's RICO conviction from banks and investors in Bayrock's developments is bank fraud, and thus criminal; and (6) Oberlander stated in the same papers: "We respectfully alert the court that we are scrupulously adhering to the standards of §455(a) and requesting you step down because of the appearance of bias and prejudice founded in corruption and criminal conspiracy. We are not here accusing the court of actually engaging in corruption and criminal conspiracy." (ECF 15-22, at 11 & f. 6, omnibus motion of November 19, 2012).

(5) **Statements of rhetorical hyperbole**, including (a) that unlike the signers of the Declaration of Independence who publicly proclaimed their actions, Glasser's court "hides what it does" out of "pusillanimous fear" and (2) the quotation Joseph N. Welch to Joseph McCarthy, "You have done enough.

Have you no sense of decency sir, at long last? Have you left no sense of decency?"

These rhetorical statements, or "statements that use language in a loose, figurative sense," see *Yagman*, 55 F.3d at 1438, are not capable of being proven true or false and are protected from punishment by the First Amendment. The Committee did not prove "false" that adjudicating cases in secret is done out of pusillanimous fear. The Committee did not prove "false" the query to Judge Glasser, Have you no decency?

After all, Judge Glasser acknowledged that he did not issue any sealing order that could have possibly have been binding on Oberlander, and after having pulled the file from National Archives and seen that there was no sealing order, he nonetheless said in that March 23, 2011 "scheduling order" that Oberlander, by unilaterally determining that there was no order binding on him, had "flouted" such a non-existent order.

"Have you no shame?"—particularly where the judge acknowledged in secret that he hadn't issued a sealing order, and acknowledged that there was no order binding upon Oberlander, but nonetheless issued a "scheduling order" gratuitously stating that Oberlander had flouted a non-existent order—cannot be proved to be false and unfounded criticism.

**D. Attorneys Must be Protected in Checking the Use of Judicial Power and Preserving Open Court Processes.**

This technical parsing of the speech for which appellants are being threatened with discipline is important to show that the Committee not only failed to prove them false, but that appellants demonstrated a reasonable basis for them, were entitled to a hearing, and are in fact protected by their First Amendment speech rights in accordance with *Yagman*, *Sullivan*, *Garrison*, *Velazquez*, and NYRPC 8.2, as noted above. Yet, the overall picture is imperative. Professor Tarkington's explained in her expert report:

- The federal courts were, as appellants have claimed, unconstitutionally hiding criminal cases and thereby illegally depriving crime victims of their CVRA and MVRA rights.

- Sater was enabled to engage in further fraud—defrauding banks, business partners, investors, etc.—by the court's hiding his conviction.

- Suppressing attorney speech regarding the judiciary deprives the citizen of the ability to self-govern in that the public loses its right to receive that information.

- The checking value of free speech was uppermost in the minds of the persons who drafted and ratified the First Amendment."

- Speech regarding the judiciary from attorneys—the only class of people with the training and exposure to offer effective criticism—is essential to check judicial power.

- Judicial punishment through discipline of speech exposing unlawful actions by one or more of its judges and defying Congressional mandatory criminal restitution constitutes unconstitutional censorship.

- It is essential to maintain the ***actual integrity of the judiciary*** that judicial abuse, incompetence or unlawfulness be checked.

- Attorneys must be able to do it ***in court filings****, s*o that the judiciary can address it and take self-corrective measures.

- That is the added importance of the *Velazquez* decision—attorneys must and do have a right to raise these arguments in court proceedings in order ***to invoke judicial power to fix problems with judicial integrity or incompetence***, either in that specific case or on appeal.

- Stifling or punishing attorney speech regarding unlawful "sealing" of cases would keep the public from being able to evaluate the integrity of the judiciary.

- The Supreme Court has recognized that the right to free speech creates a reciprocal right to receive information, including information from attorneys.[15]

- Failing to publicly docket cases removes the most essential public check on judicial power, the open court.

- As the Supreme Court explained in *Richmond Newspapers v. Virginia*, 448 U.S. 555, 569 (1980) "the value in open justice" is not just "therapeutic" but is "the keystone"—for "[w]ithout publicity, all other checks are insufficient: all other checks are of small account."

- "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed, the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known." *Press-Enterprise v. Superior Court*, 464 U.S. 501, 508 (1984) (*Press-Enterprise I*).

- In Sater's case "standards of fairness" and "established procedures" regarding notifying victims and awarding restitution pursuant to Congressional mandate were *not* followed and such "deviations" did *not* "become known" because the case was not publicly docketed.

- In *Press Enterprise II*, the Supreme Court stated that "public access serves the important function of discouraging either the prosecutor *or the court* from engaging in arbitrary or wrongful conduct"—or in this case, to disregard Congressionally mandated sentencing. *See Press-Enterprise v. Superior Court*, 478 U.S. 1, 13 (1986) (*Press-Enterprise II*).

---

[15] *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756-57 (1976); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 365-66, 372-76, 384 (1977).

- To protect open courts—*the* essential check on judicial power—attorneys must have protectable free speech rights to raise—both inside and outside of court proceedings—unlawful closure, hiding, or sealing of cases.

ECF 19 (sealed); ECF 91 (redacted), at 102-106.

**Point III: The Federal Statute of Limitations Applies to Original Federal Court Disciplinary Proceedings.**

The Committee rejected Lerner's and Oberlander's argument that the federal statute of limitations, 28 U.S.C. §2462, applies to original federal disciplinary proceedings. Nevertheless, the Committee asserted that only "in the absence of an applicable federal statute of limitations" should state law govern. (Oberlander Or. at 27). Here, the federal statute should apply.

28 U.S.C. §2462 provides that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued." In *Kokesh v. S.E.C*, 581 U.S. 455, 462 (2017), the Supreme Court held that the five-year limitations period applies if the federal government is bringing an action or proceeding that "qualifies as either a fine, penalty, or forfeiture." The Supreme Court explained:

> A "penalty" is a "punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offen[s]e against its laws." . . . This definition gives rise to two principles. First, whether a sanction represents a penalty turns in part on "whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual." . . . "[P]enal laws, strictly and properly, are those imposing punishment for an offense committed against the State." . . . Second, a pecuniary sanction operates as a penalty only if it is sought "for the purpose of punishment, and to deter others from

106

offending in like manner"—as opposed to compensating a victim for his loss.

581 U.S. at 462.

Attorney discipline falls under the definition of penalty here. It is penal, as it is imposed as a punishment for an offense against the state, and any ultimate discipline imposed is "for the purpose of punishment, and to deter others from offending in like manner." Moreover, in *Sheinbein v. Dudas*, 465 F.3d 493 (Fed. Cir. 2006), the Federal Circuit indicated that the statute applied to the exclusion of an attorney from practice before the United States Patent and Trademark Office ("USPTO"); see also, *e.g.*, *H.P. Lambert Co. v. Secretary of the Treasury*, 354 F.2d 819 (1st Cir. 1965) (statute applied to revoking broker's license, and thus could only examine conduct within five-year limitations period).

The Committee held that the federal statute of limitations did not apply because it only applied to federal agencies, like the SEC. But the statute does not limit itself to federal agencies, but instead broadly applies to any "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise" brought by the federal government. The Committee also contends that it has not found any case dealing with an original federal disciplinary proceeding that applied §2624 (*Sheinbein* was a reciprocal disciplinary case). As this Court is no doubt aware, original federal disciplinary proceedings are rare; reciprocal discipline is the norm, which is likely why there aren't original

disciplinary cases addressing this issue. Further, whether reciprocal or original should not make a difference. Finally, the Supreme Court's clarification in *Kokesh* in 2017 on the broad scope of §2624 demonstrates that it must apply.

The Committee also held that even if §2624 did apply, the "continuing violation doctrine" would allow the Committee to reach all matters charged because the statute would purportedly run from "the commission of the last wrongful act." (ECF 26, pp. 26-27, n. 14). But this cannot work for either of the two bases of discipline here. The Committee imposed discipline for attempted larceny by extortion based entirely on an email and two letters sent in 2010. They cite to nothing after November 2010 in support thereof. Despite the grievant filing for discipline in June 2014, the Committee did not issue the Disciplinary OTSCs until November 18, 2016, six years after the last letter found by the Committee to have constituted attempted extortion.

The other bases for discipline are statements made by counsel in briefs regarding the judiciary. Each act of speech is its own act and thus the Committee is time-barred in imposing discipline for any statements made prior to November 18, 2011. See *Knoll v. Merrill Corp.*, 2003 WL 22682271, *4 (SDNY 2003) (holding that each act of slander or defamation is a separate and distinct wrong and thus "tolling of the statute of limitations to account for a continuous wrong does not apply to defamation claims"); *Cheves v. Trustees of Columbia Univ.*, 89 A.D.3d

463 (1st Dep't 2011) (holding there is "no support for plaintiff's proposition that the statute of limitations governing actions for defamation is subject to a 'continuing tort' exception").

This Court must therefore vacate the disciplinary orders, and direct the Committee to dismiss all claims that predate the 2016 Disciplinary OTSC's by more than five years.

**Point IV:    The Order of June 13, 2024, Imposing an Additional Year of Suspension Must be Vacated for the Same Reasons as Set Forth Above, Plus One Additional Reason.**

On June 13, 2024, the Committee imposed an additional one-year suspension from practice for, as it purported to find, "contravening" court orders. As demonstrated above, there were no sealing orders in force at the time of any alleged transgression, nor did the Committee charge, in the OTSC charging instruments what order was violated, what the decretal language of the order was, whether it was still in force, and the specific acts and dates of the alleged violation.

We need not repeat those arguments, but instead incorporate all the arguments above, including the statute-of-limitations defense, as a basis for vacatur of the June 13, 2024 order. Appellants only add the following point: There was no finding in that order that any "contravention" by them was intentional and with venal intent. See *Peters*, supra, 642 F.3d at 394-96. Merely "contravening" an order is an insufficient basis for discipline, as an order can be inadvertently

contravened. *Id*. As all that the Committee found was that orders were "contravened." Setting aside, again, that there were no orders that were contravened, there was no finding by the Committee that such was venal and intentional; therefore, there was no basis for the finding that an additional year suspension was warranted.

**Point V:** **On Remand, the Committee Should be Directed to Have an Independent Counsel First Investigate Whether there Are Any Valid Charges, and then Advise Which Charges Warrant Prosecution.**

As demonstrated above, eight months after appellants docketed their initial submission in opposition to the Committee's OTSCs, the Committee appointed James Wicks to investigate "nunc pro tunc" whether any charges should be brought and to prosecute such charges. But Wicks did no investigation whatsoever. It is respectfully submitted that an independent counsel should not be mere window dressing. On remand, the Committee should direct that an independent attorney actually do the investigation and advise the Committee whether there is anything to be prosecuted.

**Point VI:** **The Entire Docket of this Proceeding Should be Unsealed.**

The district court has kept documents that are public, even those that have been made public by U.S. Supreme Court, either completely sealed or made public in redacted form. For example, though the petition for cert that was filed by Oberlander is public on the U.S. Supreme Court's docket, and widely available, it

is sealed on the district court's docket. Its sealing or redaction of such documents, along with documents such as the cooperation agreement and proffers, which also are publicly available, cannot be sustained. *Gambale v. Deutsche Bank*, 377 F. 3d 133, 144 (2d Cir. 2004) ("the genie is out of the bottle.") The redacting of the information from Sater's PSR that is in the papers that the Supreme Court itself made public itself shows that the district court had an unwarranted concern with protecting the judiciary and the DOJ from criticism, for this information has no bearing whatsoever on Sater's safety. The district court made a conscious effort to redact such information notwithstanding that the Supreme Court decreed that it is fair game. Such information has no bearing on Sater's safety, and there is no evidence whatsoever that Sater bears any risk. The only thing that sealing does is prevent public scrutiny of the judiciary. This must stop.[a]

---

[a] It was originally contemplated that Frederick M. Oberlander, attorney *pro se* appellant in related appeal 24-2974, would join in this brief. However, since his appeal has been incorrectly administratively dismissed by a documented ACMS system error, his status as an active appellant is currently pending resolution. Until Mr. Oberlander's appeal is reinstated, his participation in any briefing is procedurally impossible. This matter will be the subject of immediately forthcoming motion(s) by Mr. Oberlander to the Court. Apparently, the problem is that ECF and ACMS are not coordinating properly.

## Conclusion

For the foregoing reasons, appellants requests that this Court vacate the orders below, and (a) order the Committee to dismiss all charges that are time barred by 28 U.S.C. §2624; (b) hold that the Committee cannot impose discipline based on attempted larceny by extortion or for any other basis not charged in the Disciplinary OTSCs; (c) order that the Committee direct the independent counsel to actually do the investigation, advise what charges he believes may warrant discipline, and then prosecute same if such charges are converted into a charging instrument; (d) order the Committee to hold a full evidentiary hearing and accord Lerner and Oberlander full due process, instruct the Committee to apply the correct constitutional standard for imposing discipline as to speech regarding the judiciary and as indicated in NYRPC 8.2 (i.e., the subjective *NY Times v. Sullivan* standard, incorporated into NYRPC 8.2); (e) unseal every document in this proceeding in its entirety, and (f) and enter all other just and proper relief.

Dated:     Forest Hills, New York
           June 16, 2025

           Richard Lerner
           Pro se respondent-appellant
           69-46 Harrow Street
           Forest Hills, NY 11375
           (917) 584-4864
           richardlerner@msn.com

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit, Typeface Requirements and Type-Style Requirements.

    1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 27,185 words.

    2. This document complies with the typeface requirements of Fed. S. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word (2019/Office) in 14-point font, Times New Roman.

Dated:    Garden City, New York
            June 16, 2025

_____
Richard E. Lerner, Esq.
*Pro Se Respondent-Appellant*
69-46 Harrow Street
Forest Hills, NY 11375
(917) 584-4864
richardlerner@msn.com